## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

TAMIA CORNELIUS,

          Plaintiff,

vs.

SAFETY HOLDINGS, INC., d/b/a
SAMBASAFETY US

          Defendant.

**Case No.: 1:24-cv-00811**

**JURY TRIAL DEMANDED**

## COMPLAINT

Tamia Cornelius ("Plaintiff" or "Ms. Cornelius") by and through her counsel brings the following Complaint against Safety Holdings, INC., d/b/a SambaSafety US ("Defendant" or "SambaSafety") for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of an background check report, specifically a Driver Record Report, that Defendant published to Uber, which falsely portrayed that Plaintiff's standard driver's license was withdrawn, making her ineligible work for Uber as an Uber driver.

## INTRODUCTION

1.      This is an individual action for damages, costs, and attorney's fees brought against Defendant pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA").

2.      Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to users of such reports including, but not limited to, Uber, who

1

use the reports to make decisions regarding whether to engage in a business transaction with certain consumers.

3.      Defendant falsely reported to Uber, that Plaintiff's driver's license was withdrawn, making her ineligible to work for Uber. Defendant's reporting is grossly inaccurate and untrue.

4.      Plaintiff's driver's license was, and is, still valid.

5.      Uber suspended/deactivated Plaintiff's Uber account after receiving a background check report from Defendant, which erroneously showed that Plaintiff did not have an active, valid driver's license.

6.      Defendant's inaccurate reporting could have easily been avoided had Defendant performed a cursory review of the widely available DMV records from Alaska prior to publishing Plaintiff's report to her employer, Uber.

7.      Had Defendant performed even a cursory review of the DMV records, it would have discovered that Plaintiff driver's license was never withdrawn. Rather, it was Plaintiff's Commercial Driver's License ("CDL") that was no longer active because Plaintiff had not received the required medical examinations. A CDL is not required when working for Uber as a driver.

8.      Defendant does not employ reasonable procedures to assure the maximum possible accuracy of the information it reports regarding consumers. Defendant's failure to employ reasonable procedures resulted in Plaintiff's report being grossly inaccurate.

9.      Defendant committed these violations pursuant to its standard policies and practices, which harm innocent consumers seeking employment by prejudicing their prospective or current employers with inaccurate motor vehicle record information.

10.     Defendant's inaccurate report cost Plaintiff a good paying, flexible job.

2

11.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

12.     As a result of Defendant's conduct, action, and inaction, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure maximum possible accuracy based on 15 U.S.C. § 1681e(b) of the FCRA, and for failing to conduct a reasonable reinvestigation to determine whether the information Plaintiff disputed – the "Withdrawn" status of her standard driver's license – was inaccurate and should be corrected in the subject consumer report, in violation of the FCRA, 15 U.S.C. § 1681i.

## PARTIES

13.     Tamia Cornelius ("Plaintiff" or "Ms. Doe") is a natural person residing in Palmer, Alaska, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

14.     Defendant Safety Holdings, INC., d/b/a Sambasafety US G&M Hire Enterprises, LLC d/b/a AtBackgrounds ("Defendant" or "SambaSafety")  is a Delaware corporation doing business throughout the United States, including the State of Alaska and in this District, and has a principal place of business located at 8801 Horizon Blvd NE, Suite 200 , Albuquerque, NM 87113 and can be served at its registered agent at CT Corporation System, 206 S. Coronado Ave., Espanola, NM 87532.

15.     Among other things, Defendant sells background check reports, including Driver Record Reports, to online service platforms like Uber for their use in deciding whether to offer its platform and range of services to potential consumers looking to offer its services, such as in this case, transportation services.

16.     These reports are provided for the purpose of evaluating a consumer for employment such that they may offer their driving services on the Uber platform to earn income.

17.      Further, these reports are also provided in connection with a business transaction initiated by the consumer.

18.     Defendant is a consumer reporting agency as defined in 15 U.S.C. § 1681a(f) because for monetary fees, it regularly engages in the practice of evaluating and/or assembling information on consumers for the purpose of furnishing consumer reports for employment purposes to third parties, and uses interstate commerce, including the Internet, for the purpose of preparing and furnishing such consumer reports.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District.

## STATUTORY BACKGROUND

21.     Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such

as when they applied for a job or credit, and when they applied for housing.  Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

22.    While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports.  15 U.S.C. § 1681.

23.    Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

24.    Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

**THE FCRA'S PROTECTIONS FOR BUSINESS TRANSACTIONS**

25.    Despite its name, the Fair Credit Reporting Act covers more than just credit reporting, it also regulates employment background check reports like the one Defendant prepared in Plaintiff's name.

26.    The FCRA provides a number of protections for job applicants who are the subject of background checks for purposes of securing employment, housing, and other purposes.

27.    In the parlance of the FCRA, background checks are "consumer reports," and providers of background checks, like Defendant, are "consumer reporting agencies."  15 U.S.C. §§ 1681a(d) and (f).

28.    The FCRA imposes duties on consumer reporting agencies to assure that consumer reports are accurate and that "consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681.

29.    Under 15 U.S.C. § 1681e(b), consumer reporting agencies are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

30.    Defendant disregarded its duties under the FCRA with respect to Plaintiff's background check report.

### DEFENDANT'S ILLEGAL BUSINESS PRACTICES

31.    Over the past 15 years, there has been increased collection and aggregation of consumer data, including criminal records and sex offender registration data. As a result of the increasing availability of this data, there has been a boom in the background check industry.

32.    As summarized in a recent report by the Consumer Financial Protection Bureau[1], a 2018 survey of employers found that 95 percent of employers surveyed conducted one or more types of background screening. CFPB Report at 4.

33.    The background check industry takes in revenues in excess of three billion dollars, annually.

34.    Background checks are generally created by running automated searches through giant databases of aggregated public record data. The reports are created and disseminated with

---

[1] CFPB, Market Snapshot: Background Screening Reports (Oct. 2019), https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf ("CFPB Report").

little to no manual, in-person review, and the underlying records are rarely directly reviewed in creating background checks.

35.    Background check companies, like Defendant, collect, among other things, countless motor vehicle records ("MVR") from a number of sources with data from county, state, and federal level sources.

36.    Given that Defendant is in the business of selling background checks, Defendant should be well aware of the FCRA and the attendant harm to consumers for reporting inaccurate or outdated information.

37.    Defendant places its business interests above the rights of consumers and reports such inaccurate information because it is cheaper for Defendant to produce reports containing information that is inaccurate and incomplete than it is for Defendant to exert proper quality control over the reports prior to their being provided to Defendant's customers.

38.    Defendant reports such erroneous and incomplete information because it wants to maximize the automation of its report creation process, thereby saving the costs associated with conducting the additional review necessary to remove the inaccurate or out-of-date entries.

39.    Defendant charges its customers the same price for reports that are grossly inaccurate as it does for accurate reports.

40.    Appropriate quality control review of Plaintiff's report would have made clear that Defendant was reporting that Plaintiff had a withdrawn standard driver's license when her driver's license was in fact valid.

41.    As a provider of background check reports, Defendant should be aware of the FCRA requirements and is likely a member of the Professional Background Screening Association

("PBSA").  PBSA hosts a conference at least once a year where presenters discuss compliance with federal and state consumer reporting laws.

## FACTS

### Plaintiff's Passion for Working

42.    Plaintiff has been working since she was fourteen and has developed a passion and a love for it ever since as she feels that it gives her a sense of purpose.

43.    Roughly four years ago Plaintiff was injured when working as an equipment operator for the city of Anchorage. As a result of her injuries, Plaintiff suffers with chronic regional pain syndrome, which makes it hard for her to walk and lift. Plaintiff was unable to work for approximately two and a half years after her injury, which was very stressful for her.

44.    Thus, Plaintiff was ecstatic when she was able to start working for Uber roughly two years ago, and very distressed after she found out her Uber account was deactivated/suspended. Uber is the most ideal job for Plaintiff because the flexibility allows her to manage her work schedule with her pain.

### Defendant Published an Inaccurate Background Check Report to Uber

45.    Uber contracted with Defendant to conduct background checks, including motor vehicle records background checks, on its prospective and current drivers listed on the Uber platform.

46.    Plaintiff has been working with Uber as a full-time Uber driver since August 2022, without any issue. Plaintiff has no other reliable sources of income.

47.    On or about May 22, 2024, Uber ordered a Driver Record Report ("consumer report") on Plaintiff from Defendant.

48.    On or about May 22, 2024, in accordance with its standard procedures, Defendant completed its consumer report about Plaintiff and sold the same to Uber.

49.    Within that consumer report, Defendant published inaccurate information about Plaintiff.

50.    Specifically, Defendant's consumer report about Plaintiff erroneously included information showing that Plaintiff's driver's license was withdrawn, which appeared in the consumer report as follows:

```
LICENSE NUMBER ->  ████████

ORIG.ISSUED   ISSUED     EXPIRES     CLASS                      STATUS
-----------  ----------  ----------  ----------------------  ----------------------
02/28/2013   05/15/2019  05/15/2027 A                           WITHDRAWN
------------------------------------------------------------------------------------
```

51.    The "Withdrawn" status of Plaintiff's driver's license reported by Defendant about is completely inaccurate.

52.    Plaintiff had, and currently has, an active, valid driver's license.

53.    A cursory review of the widely available motor vehicle records confirms that Plaintiff driver's license was never withdrawn.  Rather, the record confirms that only Plaintiff's CDL was withdrawn, which is not required to work on the Uber platform as an Uber driver.

54.    The sole reason the inaccurate "Withdrawn" driver's license status was reported on the consumer report concerning Plaintiff was that Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information it published within the consumer report it sold about Plaintiff to Uber.

55.    Had Defendant followed reasonable procedures, it would have discovered that Plaintiff's driver's license was never withdrawn and would not have reported the same.

56.     In preparing and selling a consumer report about Plaintiff, wherein Defendant published to Uber inaccurate information about Plaintiff, Defendant failed to follow reasonable procedures to assure that the report was as accurate as maximally possible, in violation of 15 U.S.C. § 1681e(b).

**Uber Suspends/Deactivates Plaintiff's Account Leaving Plaintiff Without a Way to Earn Income**

57.     On or around May 22, 2024, Plaintiff tried to login to Uber to start working but was denied access. Instead, Plaintiff was met with a warning message letting her know she had something to resolve regarding her background screening.

58.     Accordingly, Plaintiff checked her email and saw a message from Uber identifying a consumer report sold to it by Defendant as the reason for the suspension of her Uber account.

59.     Shortly thereafter, Plaintiff obtained a copy of the subject consumer report and was shocked upon reviewing Defendant was reporting within the subject consumer report that Plaintiff's driver's license was withdrawn and had concluded that Plaintiff was not eligible to drive for Uber because of it.

60.     Plaintiff's driver's license at the time was active and valid. Only Plaintiff's CDL was withdrawn because she had not undergone medical examinations.

61.     Shocked and frustrated, Plaintiff contacted Uber to understand what was going on and informed them that her driver's license was still valid, and her driver's license status was not withdrawn.

62.     Uber confirmed she did not need a CDL or medical certificate to drive with them but informed her that the reason she was being denied access to her Uber account was the "Withdrawn" status on the consumer report from Defendant.

63.     Plaintiff, on May 27, 2024, was finally able to get Uber to run another Driver Record Report on her by sending them her license and explaining it was valid. However, once again, Defendant published a consumer report to Uber stating Plaintiff's driver's license was withdrawn and that Plaintiff is not eligible for driving.

64.     Plaintiff was very panicked, confused, and concerned about the impact the inaccurate reporting would have on her future and her ability to earn a living.

65.     Specifically, Defendant repeatedly reported a "Withdrawn" driver's license status that is clearly listed as valid and active in the public motor vehicle records. The public motor vehicle records were available to Defendant prior to publishing Plaintiff's consumer report to Uber, but Defendant failed to obtain or perform even a cursory review of such information.

**Plaintiff Went to the DMV to Investigate Whether there was an Issue with her Driving Record**

66.     On or about May 28, 2024, Plaintiff went to the DMV to investigate what was going on with her driving record. The DMV confirmed that Plaintiff had a valid license and only her CDL status was not active.

67.     Plaintiff explained the situation with her Uber account and the representative at the DMV decided to update her records to try to avoid an issue like this from re-occurring.

68.     The DMV representative removed the "withdrawn" mentions and instead input that Plaintiff was "interstate exempted," which demonstrates that she does not need medical certification to maintain her driver's license. Plaintiff was hopeful that this course of action would work and make clear to Defendant that Plaintiff's driver's license was in fact valid.

**Plaintiff Disputed the Misinformation in Defendant's Consumer Report**

11

69. On May 28, 2024, desperate to start working again, and riddled with worry over the far-reaching impacts of the inaccurate information, Plaintiff disputed the inaccurate information with Defendant. Plaintiff disputed online with Defendant.

70. Plaintiff identified herself and provided information to Defendant to support her dispute.

71. Plaintiff specifically disputed the inaccurate reporting of the "withdrawn" driver's license status and included a copy of the updated DMV records. Plaintiff explained that she does not need a medical certificate to have a valid standard driver's license, and Uber does not require such a certificate.

72. Plaintiff specifically asked Defendant to investigate and correct its reporting in any consumer report about Plaintiff.

**Defendant Failed to Conduct a Reasonable Reinvestigation and Correct the Consumer Report**

73. On June 7, 2024, Plaintiff received Defendant's correspondence stating they were unable to investigate her dispute because she did not include sufficient information regarding what she was disputing or did not send enough documents to support her dispute.

74. Plaintiff contacted Defendant again to explain the situation.

75. On June 10, 2024, Defendant responded that it received Plaintiff's dispute, and they are not permitted to "re-run" Plaintiff's MVR check, ignoring their duties under the FCRA.

76. Thereafter, and as of the date hereof, Defendant failed to issue a corrected consumer report to Uber.

77. Despite Plaintiff's dispute, Defendant failed to conduct a reasonable reinvestigation of Plaintiff's dispute and failed to correct the disputed information in violation of 15 U.S.C. § 1681i(a)(1)(A).

78. Because Defendant failed to issue a corrected consumer report, Plaintiff has been unable to use her Uber account to offer her transportation services and earn income.

79. During the summer months in Alaska, tourism is at its peak and Plaintiff's inability to work on the Uber platform has costed her thousands of dollars in lost income. Last Summer, Plaintiff made an average of approximately $7,000 a month. To date, Plaintiff has been unable to work on the Uber platform for over two months.

80. Furthermore, on or about August 1, 2024, Plaintiff lost her status as a "diamond driver" because of her suspended/deactivated Uber account. The "diamond driver" status comes with certain perks which allow drivers to maximize their time and profitability. For example, Uber drivers with "diamond driver" status are able to see the length of the requested Uber ride, which allows them to disregard nominal rides and focus their attention on more profitable, longer distance rides. In addition, Uber drivers that maintain the "diamond driver" status are eligible for a bonus of approximately $250 at the end of each year.

81. But for Defendant's inaccurate consumer report, Plaintiff would have continued to work as an Uber driver, and Plaintiff would have been spared the humiliation, embarrassment, and stress imposed upon Plaintiff to correct Defendant's erroneous reporting.

82. Defendant's false report cost Plaintiff a well-paying, flexible job and ability to earn income through the Uber platform. Plaintiff has been relegated to borrowing money from her son

to help pay for her bills and living expenses, which has been difficult for Plaintiff since she feels she is the one that should be taking care of her son.

83. Due to Defendant's unreasonable procedures and shoddy, if any, dispute reinvestigation, and despite Plaintiff's continued efforts, as of the date hereof, Plaintiff has been unemployed for approximately two months.

84. The injuries suffered by Plaintiff as a direct result of Defendant's erroneous reporting are the type of injuries that the FCRA was enacted to address. Under common law, Defendant's conduct would have given rise to causes of action based on defamation and invasion of privacy.

85. As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

86. Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

87. Defendant is a "consumer reporting agency" as defined by 15 U.S.C. § 1681a(f).

14

88.     At all times pertinent hereto, Plaintiff was a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

89.     At all times pertinent hereto, the above-mentioned Driver Record Report or consumer report was a "consumer report" as that term is defined by 15 U.S.C. § 1681a(d).

90.     Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to "follow reasonable procedures to assure maximum possible accuracy" in the preparation of the consumer report it sold about Plaintiff as well as the information it published within the same.

91.     As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

92.     Defendant willfully violated 15 U.S.C. § 1681e(b) in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

93.     Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i

15

**Failure to Perform a Reasonable Reinvestigation**

94.     Plaintiff re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs as if fully stated herein.

95.     The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

96.     The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

97.     On at least one occasion during 2024, Plaintiff disputed the inaccurate information with Defendant and requested that Defendant correct the inaccurate information in the consumer report that is patently inaccurate, misleading, and highly damaging to her..

98.     In response to Plaintiff's dispute, Defendant failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in the consumer report and refused to correct the consumer report at issue.

99.     Defendant violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate; by failing to correct the disputed inaccurate information from the subject consumer report; by failing to follow reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file; and/or by relying upon verification from a public source it has reason to know is unreliable.

100.    As a result of Defendant's violations of the FCRA, Plaintiff has suffered a range of actual damages including, without limitation, loss of employment opportunities, wages, and benefits; loss of economic opportunities; loss of time and money trying to correct her background check report; the expenditure of labor and effort disputing and trying to correct the inaccurate reporting; damage to her reputation; loss of sleep; lasting psychological damage; loss of capacity for enjoyment of life; and emotional distress, including mental anguish, anxiety, fear, frustration, humiliation, and embarrassment.

101.    Defendant willfully violated 15 U.S.C. § 1681i in that its conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

102.    Plaintiff is entitled to recover statutory damages, punitive damages, and reasonable attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.     Determining that Defendant negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.   Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 14th day of August 2024.

**CONSUMER ATTORNEYS**

*/s/ Tarek N. Chami*
Tarek N. Chami – MI# P76407
CONSUMER ATTORNEYS
22000 Michigan Ave, Suite 200
Dearborn, MI 48124
T: (313) 447-0488
E: tchami@consumerattorneys.com

*Attorneys for Plaintiff,*
*Tamia Cornelius*