**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

TAMIA CORNELIUS,

Plaintiff,

vs. No. CIV 24-0811 JB/LF

SAFETY HOLDINGS, INC., d/b/a
SAMBASAFETY US,

Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the: (i) Defendant Safety Holdings, Inc.'s Bench Memorandum in Support of Motion for Judgment as a Matter of Law, filed February 18, 2026 (Doc. 145)("Bench Memo"); (ii) Plaintiff's Request for Entry of Judgment Pursuant to Federal Rule of Civil Procedure 58(d), filed March 2, 2026 (Doc. 159)("Motion for Entry of Judgment"); (iii) Defendant Safety Holdings, Inc.'s Opposed Motion for Judgment as a Matter of Law and, Alternatively, for Remittitur, filed March 20, 2026 (Doc. 163)("RJMOL Motion"); and (iv) Defendant Safety Holdings, Inc.'s Opposed Motion for Protective Order, filed March 25, 2026 (Doc. 165)("Motion to Seal"). The Court holds a hearing on May 28, 2026. See Clerk's Minutes at 1, filed May 28, 2026 (Doc. 178)("Clerk's Minutes"); Draft Hearing Transcript of Proceedings at 1 (taken May 28, 2026)(Court)("May, 2026, Tr.").[1] The primary issues are: (i) whether Defendant Safety Holdings, Inc., doing business as SambaSafety US ("SambaSafety"), is entitled to judgment as a matter of law on the issue of accuracy, where SambaSafety alleges its reporting, regarding Plaintiff Tamia Cornelius, is an accurate transcription of official government records; (ii) whether SambaSafety is entitled to judgment as a matter of law on the issue of whether are

[1] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

reasonable to ensure maximum possible accuracy, where it alleges it faithfully and completely reports an official government record; (iii) whether SambaSafety is entitled to judgment as a matter of law on the issue of liability under 15 U.S.C. § 1681i, where it alleges the jury's verdict lacks a legally sufficient evidentiary basis; (iv) whether remittitur is appropriate, where SambaSafety alleges the damages awards are contrary to the evidence; and (v) whether the Court should enter a protective order, maintaining under seal certain trial exhibits, where SambaSafety alleges the exhibits contain sensitive business information sufficient to overcome the public's right of access to the exhibits. After reviewing the parties' submissions and the applicable law, the Court concludes that: (i) SambaSafety is not entitled to judgment as a matter of law on the issue of accuracy, where SambaSafety alleges its reporting is an accurate transcription of official government records, because there is a legally sufficient evidentiary basis for the jury to conclude that SambaSafety does not interpret accurately the official government record concerning Cornelius' driving privileges; (ii) SambaSafety is not entitled to judgment as a matter of law on the issue of reasonable procedures to ensure maximum possible accuracy, where it alleges it faithfully and completely reports an official government record, because there is a legally sufficient evidentiary basis for the jury to conclude that SambaSafety's procedures do no ensure maximum possible accuracy when the reports do not contain the complete official government record; (iii) SambaSafety is not entitled to judgment as a matter of law on the issue of liability under 15 U.S.C. § 1681i, where it alleges that the jury's verdict lacks a legally sufficient evidentiary basis, because the jury's verdict rests on a legally sufficient evidentiary basis to conclude that Conelius provides SambaSafety enough information for it to investigate the information she disputes; (iv) remittitur is not appropriate, where SambaSafety alleges the damages awards are contrary to the evidence, because the jury's damages are constitutionally appropriate; and (v) the Court does not enter a

protective order, maintaining under seal certain trial exhibits, where SambaSafety alleges the exhibits contain sensitive business information sufficient to overcome the public's right of access to the exhibits, because SambaSafety does not make the necessary showing to overcome the public's right of access to judicial records. Accordingly, the Court denies the Bench Memo, grants in part and denies in part the RJMOL Memo, denies the Motion to Seal, and grants Cornelius' motion for Entry of Damages.

**FACTUAL BACKGROUND**

Below the Court discusses an abbreviated factual background, because the parties largely agree on the factual underpinnings of the RJMOL Motion and the Motion to Seal. The Court draws the factual background from the: (i) Trial Transcript Day 1 Cornelius, filed March 20, 2026 (Doc. 164-1)("Cornelius Day One Tr."); (ii) Trial Transcript Day 2 Cornelius, filed March 20, 2026 (Doc. 164-1)("Cornelius Day Two Tr."); (iii) Trial Transcript Day 2 Isanaka, filed March 20, 2026 (Doc. 164-1)("Isanaka Day Two Tr."); (iv) Trial Transcript Day 3 Isanaka, filed March 20, 2026 (Doc. 164-1)("Isanaka Day Three Tr."); (v) Trial Transcript Day 3 Tavernier, filed March 20, 2026 (Doc. 164-1)("Tavernier Day Three Tr."); (vi) Deposition of Uber Technologies' 30(b)(6) representative Blake Evan Pierce, filed on October 14, 2025 (Doc. 26-3)("Uber Depo."); (vii) Deposition the Alaska DMV's 30(b)(6) representative, Acting Director of the Alaska DMV, Kathleen Wallace, filed on October 14, 2025 (Doc. 26-7)("DMV Depo."); (viii) the Deposition of SambaSafety's 30(b)(6) representative, the Director of Data and Analytics, Sudheer Reddy Isanaka, filed on October 14, 2025 (Doc. 26-10)("SambaSafety Depo."); (ix) AlaskaDMV000002 -- 240528 Plaintiff's Alaska DMV CDL Verification ("Ex. J-03"); (x) AlaskaDMV000009-11 -- 220312 Alaska DMV Notice re Plaintiff's CDL Redacted ("Ex. J-04"); (xi) Uber-Cornleius000027-35 -- Plaintiff's Uber Payment History ("Ex. J-33"); (xii) Safetyholdings-

Cornelius000013-23 -- 240522 SambaSafety Raw Data (To Uber) Redacted ("Ex. J-10"); (xiii) Safetyholdings-Cornelius000004-12 -- 240522 SambaSafety Raw Data (From AK DMV) Redacted ("Ex. J-09"); (xiv) Safetyholdings-Cornelius000026-35 -- 240527 SambaSafety Raw Data (From AK DMV) Redacted ("Ex. J-12"); (xv) Safetyholdings-Cornelius000036-46 -- 240527 SambaSafety Raw Data (To Uber) Redacted ("Ex. J-13"); (xvi) Safetyholdings-Cornelius000050-52 -- 240527 Salesforce Case 01154134 Redacted ("Ex. J-15"); (xvii) Safetyholdings-Cornelius000053-54 -- 240528 Salesforce Case 01154883 Redacted ("Ex. J-16"); (xviii) Safetyholdings-Cornelius000055-57 -- 240528 Plaintiff's Alaska Driving Record Redacted ("Ex. J-17"); and (xix) Safetyholdings-Cornelius000063-107 -- 231022 Uber + Safety Holdings Agreement ("Ex. P-19").

**1. SambaSafety's Business and Procedures.**

SambaSafety provides motor vehicle reports ("MVR") to companies like Uber, Inc. to screen and monitor the driving record of potential or existing employees. Isanaka Day Two Tr. at 1:25-2:17. SambaSafety obtains the information that its MVRs contain directly from the applicable State DMV. See Isanaka Day Two Tr. at 1:25-2:17. Cornelius is a resident of Alaska. See Cornelius Day One Tr. at 2:3-8. On October 23, 2009, Cornelius obtains a Class A license, also known as a commercial driving license ("CDL"), and, as of that same day, the Alaska DMV designates her Class D personal driver's license as expired. See Ex. J-03 at 2.[2] In 2022, Cornelius violates Alaska's CDL requirements by not complying with its medical certificate requirement. See Ex. J-04 at 2. As a result, all her CDL privileges -- at that time a Class A license -- are

[2] Although the Alaska DMV designates Cornelius' Class D personal license as expired, when she receives her CDL, Cornelius maintains Class D driving privileges, because the "CDL encompasses every type of vehicle from a class B down so it also encompasses a class D." DMV Depo. at 37:1-18.

withdrawn. See Ex. J-04 at 2.

Cornelius begins driving for Uber, Inc. in 2022. See Cornelius Day Two Tr. at 10:24-11:3. Cornelius earns approximately $40,000.00 through Uber, Inc. in 2023. See Ex. J-33. On May 22, 2024, Uber, Inc. requests an MVR concerning Cornelius from SambaSafety. See Isanaka Day Two Tr. at 22:5-15. On the same day that it receives Uber, Inc.'s order for an MVR, SambaSafety obtains Cornelius' driving record from the Alaska DMV. See Isanaka Day Two Tr. at 30:9-12; Ex. J-10. The Alaska DMV provides SambaSafety with Conelius' official driving record in the State's "XML" data format. Ex. J-09. In May, 2024, the Alaska DMV data reflects Cornelius' Class D personal driver's license has an expiration date of 2009. See Ex. J-09. The same data for Cornelius' Class A commercial license shows that on April 12, 2022, the Alask DMV takes action code "4" against the license. Ex. J-09. The XML data lists the action withdrawal reason as "EXPIRED MED CERT." Ex. J-09. Acting Director of the Alaska DMV, Kathleen Wallace, confirms that Cornelius' Class D personal license expires in 2009, see DMV Depo. at 37:15-18, and that her "CDL license was withdrawn in April of 2022," DMV Depo. at 37:20-23.

On May 22, 2024, the same day SambaSafety accesses the DMV's records, SambaSafety formats the XML data it receives from the Alaska DMV and sends the MVR to Uber, Inc. in the JavaScript Object Notation ("JSON") electronic data format that Uber, Inc. requests. See Ex. J-10. In that MVR, SambaSafety reports to Uber, Inc. that Cornelius' Class D personal driver's license expires in 2009, and that the Alaska DMV withdraws her CDL on April 12, 2022, because of her noncompliance with the DMV's medical certificate requirements. See Ex. J-10. Select excerpts from the Alaska DMV's transmission and SambaSafety's JSON report are shown below:

| Alaska DMV Data Sent to SambaSafety | SambaSafety MVR Data Sent to Uber |
|---|---|
| <CLASS_CODE>D | "classCode": "D" |
| <ISSUE_DATE>2007-06-08 | "issueDate": "2007-06-08" |
| <EXPIRATION_DATE>2009-10-23 | "expirationDate": 2009-10-23 |
| <CLASS_CODE>A | "classCode": "A" |
| <ISSUE_DATE>2019-05-15 | "issueDate": "2019-05-15" |
| <ACTION_WITHDRAWL_REASON_DESC >EXPIRED MED CERT | "name": "WITHDRAWN" "explanation": "NON-COMPLIANCE" "description": "EXPIRED MEDICAL CERTIFICATE" |
| <VIOLATION_DATE>2022-03-12 | "offenseDate": "2022-03-12" |
| <EFFECTIVE_DATE>2022-04-12 | "date": "2022-04-12" |

Ex. D-04. The Alaska DMV does not report any data about Cornelius' overall privileges. See Ex. J-09; Ex. J-10. SambaSafety accesses the same Alaska DMV data on May 27, 2024, when Uber, Inc. requests a second MVR. See Ex. J-12; Ex. J-13. On May 27, 2024, SambaSafety reports to Uber, Inc. that the Alaska DMV data reflects: (i) Cornelius' Class D personal driver's license has an expiration date of 2009; and (ii) the Alaska DMV withdraws Cornelius' CDL as of April, 2022. See Ex. J-12; Ex. J-13.

**2. Uber, Inc. Terminates Cornelius' Employment.**

When Uber, Inc. orders an MVR from SambaSafety, Uber, Inc. expects SambaSafety to return the same driving record content SambaSafety receives from the State DMV, without alteration or addition. See Uber Depo. at 74:20-25; id. at 75:1-8; id. at 75:20-76:1. Uber, Inc. then uses that MVR to determine whether the individual is eligible to drive on Uber, Inc.'s platform, based on Uber, Inc.'s own self-selected criteria. See Uber Depo. at 73:11-16; id. at 73:21-23. Uber, Inc. testifies that if it "received information that showed only withdrawn commercial driver's license and expired personal driver's license," it would determine the consumer is not eligible to

drive for its platform. Uber Depo. at 83:1-13 ("If we received information that does not show privileges to drive for any license type, they would not be eligible regardless of if it came from the DMV or Samba.").

**3. Cornelius Disputes SambaSafety's MVR.**

Cornelius submits disputes to SambaSafety through SambaSafety's online portal on May 27 and 28, 2024. See Tavernier Day Three Tr. at 15:16-23. On May 27, 2205, Cornelius' submits the first dispute stating "Uber does not require a CDL. My license is still valid regardless of lack of medical documentation. Your report is inaccurate since the company doesn't require a CDL and my license is valid." Ex. J-15 at 1. Cornelius lists the description of the dispute as "Medical documentation." Ex. J-15 at 1. On June 10, 2024, SambaSafety sends a response to Cornelius informing her that: (i) SambaSafety "is not involved in any hiring/approval decisions"; (ii) if she "believe[s] that something recently changed or been updated," then she should ask Uber, Inc. to rerun her MVR; and (iii) if she believes the State DMV "has sent us inaccurate information," she should contact the State DMV to correct her official driving record. Ex. J-15 at 2. SambaSafety considers Cornelius' first dispute sufficiently specific to investigate the dispute. See Isanaka Depo. at 163:9-11 (stating: "Yes. Yes. That's correct" in response to Cornelius asking: "So the first dispute is clear what she's disputing, correct?").

On May 28, 2024, Cornelius submits the second dispute. See Ex. J-16 at 1. The only text that she provides in the second dispute's description is: "Denial to work for Uber in the state of Alaska," with nothing in the body of the dispute. Ex. J-16 at 1. She supplements, however, the mostly empty dispute with "supporting documents" from the Alaska DMV, Ex. J-16 at 1, and SambaSafety knows the first dispute relates to the second dispute "because [SambaSafety] designated it as a parent and child," linking the second dispute with the first, Isanaka Day Three

Tr. 85:12-86:2. On June 7, 2024, SambaSafety responds to the second dispute by informing Cornelius:

> [It is] unable to investigate your dispute for one (or both) of the following reasons: (i) Your dispute does not provide sufficient information to investigate the disputed information. This means we have not been provided with sufficiently specific information to understand what exactly you are disputing or the basis for your dispute. (ii) Your dispute does not contain supporting documentation or other information to permit us to investigate your dispute.

Ex. J-16 at 2. Cornelius does not provide the additional information requests. See Cornelius Day One Tr. at 95:3-15.

Cornelius also physically visits the Alaska DMV on May 28, 2024. See Cornelius Day One Tr. at 74:22-24. While at the Alaska DMV, Cornelius submits a form self-certifying that she meets the medical certificate requirement exceptions. See Cornelius Day One Tr. at 75:3-24; Ex. J-02. The Alaska DMV's witness confirms that, after Cornelius submits the form, the Alaska DMV removes the "withdrawal status" from Cornelius' "driving record," DMV Depo. at 33:5-13, meaning that the only record entry preventing her from driving for Uber, Inc. no longer appears on her record, see Uber Depo. at 36:9-17 (stating the "sole reason that Plaintiff was not allowed to continue to drive with Uber was because of her license having a status of withdrawn"). The abstract that Cornelius then obtains from the Alaska DMV on May 28 also reflects the removal of "withdrawn." Cornelius Day One Tr. at 76:9-77:4; id. 78:2-24. See Ex. J-17.

On May 29, 2024, Cornelius informs Uber, Inc. that she "updated" her driving record, which she wants to "give" to Uber, Inc. See Ex. P-19 at 3. Just twenty minutes later, Uber, Inc. acknowledges that update, and Uber, Inc. instructs Cornelius to re-upload her driver's license so that Uber, Inc. can order a new MVR from SambaSafety. See Ex. P-19 at 3 ("Based on the information available, it appears that we need to update your motor vehicle report with the latest details. To facilitate this, we kindly ask you to upload your current Driver's License using the link

provided . . .or through the driver app."). Had Cornelius done what Uber, Inc. told her to do, she can begin driving again for Uber, Inc. See Uber Depo. at 36:9-17 (stating that the "status of withdraw" is the sole reason Uber, Inc. removes Cornelius from the platform). Cornelius does not respond to Uber, Inc's May 29, 2024, request to upload the license she updates on May 28, 2024. See Cornelius Day One Tr. at 87:17-24; id. at 89:11-18. In addition to not taking the appropriate steps for Uber, Inc. to rehire her, Cornelius "did not apply to a single other driving position during the period of time from May 2024 to July 2025." Cornelius Day Two Tr. at 12:11-16. See id. at 13:21-14:6. In July, 2025, fifteen months after Uber, Inc. requests that Cornelius upload her license, Cornelius asks Uber, Inc. to re-run her MVR, and Uber, Inc. immediately approves Cornelius to drive again for Uber, Inc. See Cornelius Day Two Tr. at 14:7-14 (acknowledging that she is "back on the platform, approved to drive less than 24 hours after" she reapplies).

Cornelius seeks damages "related to lost income and associated stress and anxiety from that loss of income." Cornelius Day One Tr. at 99:24-100:3. Other than her own testimony, Cornelius produces no documentary evidence or any other witness at trial to corroborate the distress she alleges. See Cornelius Day One Tr. at 99:24-101:8. She also admits that she never seeks medical treatment for stress or anxiety, and never seeks counseling, and a provider does not diagnose her with any stress-related or anxiety disorder. See Cornelius Day One Tr. at 100:4-20. Cornelius admits her finances greatly improve in October, 2024, because of a "$500,000 inheritance," which alleviates her distress. Cornelius Day One Tr. at 101:9-18. See id. 103:1-13 (agreeing that her "specific symptoms, such as sleeplessness and loss of appetite" disappear "[w]hen I was told the amount I was going to receive from my parents' death").

## PROCEDURAL BACKGROUND

On March 20, 2026, SambaSafety files the RJMOL Motion. See RJMOL Motion at 1. In

support of the RJMOL Motion, SambaSafety files the Defendant Safety Holdings, Inc.'s Memorandum in Support of Motion for Judgment as a Matter of Law and, Alternatively, for Remittitur at 1, filed March 20, 2026 (Doc. 164)("RJMOL Memo"). On March 25, 2026, SambaSafety files a motion to maintain certain trial exhibits under seal, see Motion to Seal at 1, and the Defendant Safety Holdings, Inc.'s Memorandum in Support of Opposed Motion for Protective Order, filed March 25, 2025, (Doc. 166)("Motion to Seal Memo"). In response to the Motion to Seal, Cornelius files the Opposition to Defendant's Motion for Protective Order, filed April 8, 2026 (Doc. 169)("Motion to Seal Response"). In response to the RJMOL Motion, Cornelius files the Plaintiff's Response and Memorandum in Opposition to Defendant Safety Holdings Inc.'s Motion for Judgment as a Matter of Law and Alternative Motion for Remittitur, filed April 17, 2026 (Doc. 171)("RJMOL Response"). In reply to the Motion to Seal Response, SambaSafety files the Defendant Safety Holdings, Inc.'s Reply in Support of Opposed Motion for Protective Order, filed April 22, 2026 (Doc. 172)("Motion to Seal Reply"). In reply to the RJMOL Response, SambaSafety files the Defendant Safety Holdings, Inc.'s Reply in Support of Motion for Judgment as a Matter of Law and, Alternatively, for Remittitur, filed May 14, 2026 (Doc. 176)("RJMOL Reply"). Below, the Court briefly summarizes the parties' arguments.

**1. The RJMOL Memo.**

**a. Judgment as a Matter of Law.**

In the RJMOL Motion, SambaSafety moves for judgment as a matter of law, pursuant to rule 50(b) of the Federal Rules of Civil Procedure, on Cornelius' claims "under 15 U.S.C. §§ 1681e(b) and 1681i of the Fair Credit Reporting Act." RJMOL Motion at 1. In the RJMOL Memo, SambaSafety makes four arguments that it is entitled to judgment as a matter of law. See RJMOL Memo at 8-20. First, SambaSafety asserts that its "reporting was accurate, defeating all Plaintiff's

claims." RJMOL Memo at 8. Second, SambaSafety contends that its "reporting procedures were reasonable." RJMOL Memo at 13. Third, SambaSafety alleges that the "jury lacked evidence to find liability under 15 U.S.C. § 1681i." RJMOL Memo at 14. Finally, SambaSafety asserts that the "jury's award of punitive damages for Plaintiff's claims under § 1681e(b) is contrary to the jury's factual findings and must be vacated." RJMOL Memo at 20.

**i. Accuracy.**

SambaSafety asserts that the trial evidence demonstrates Cornelius' MVRs are accurate. See Motion at 10. SambaSafety begins by stating "a claim under § 1681e(b) or § 1681i(a) requires a threshold showing of inaccurate reporting." RJMOL Memo at 8 (citing Wright v. Experian Information Sols., Inc., 805 F.3d 1232, 1242 (10th Cir. 2015)("Wright")). SambaSafety argues that judgment as a matter of law based on the issue of accuracy is appropriate, because: (i) Cornelius never presents to the jury "the issue on which the Court denied summary judgment regarding accuracy," RJMOL Memo at 9; (ii) the trial evidence demonstrates "SambaSafety's report unquestionably matched the driving record provided by the Alaska DMV," RJMOL Memo at 10 (citing Ex. J-09 and Ex. J-10); and (iii) the MVRs are not misleading, because SambaSafety reports the complete DMV record and does not modify the DMV's records, see RJMOL Motion at 11. Because of these arguments, SambaSafety asserts that Cornelius cannot make the threshold showing of inaccuracy, "which defeats Plaintiff's claims." RJMOL Memo at 8.

**ii. The Reasonableness of the Procedures.**

SambaSafety asserts that its reporting procedures are reasonable. See RJMOL Memo at 13. This reasonableness, according to SambaSafety, entitles it to judgment as a matter of law on Cornelius' § 1681e(b) claim, "because it was reasonable as a matter of law for SambaSafety to rely on and report the same information as the official government source for that information."

RJMOL Memo at 13. SambaSafety cites Cassara v. DAC Services, Inc., 276 F.3d 1210 (10th Cir. 2002)("Cassara"), for the proposition that, "when 'consumer reporting agency accurately transcribes, stores and communicates consumer information received from a source that it reasonably believes to be reputable, and which is credible on its face, the agency does not violate' the FCRA." RJMOL Memo at 13 (quoting Cassara, 276 F.3d at 1217). Moreover, SambaSafety cites the Order, filed December 5, 2025 (Doc. 81)("Order"), where the Court distinguishes between cases where credit reporting agencies ("CRA") purely transcribe government data from cases where CRAs interpret government data, to argue SambaSafety's reporting is reasonable. See RJMOL Memo at 13-14 (stating that this Court uses the phrase "'license status failed' . . . [to] distinguish this case from the multitude of decisions" in line with Cassara (quoting Order at 96-98)). According to SambaSafety's logic, the element that prevents it from winning on summary judgement "is gone, and judgment as a matter of law is now required." RJMOL Memo at 14.

**iii. Liability Under 15 U.S.C. § 1681i.**

SambaSafety asserts that the "jury's verdict under § 1681i lacked a legally-sufficient evidentiary basis." RJMOL Memo at 14. The evidentiary basis is not legally sufficient, according to SambaSafety, because: (i) Cornelius does not identify the items of information she alleges are inaccurate, which § 1681i(a)(1) requires, see RJMOL Memo at 14; (ii) Cornelius' claim "fails for lack of provable damages, a required element under § 1681i(a)," RJMOL Memo at 16; and (iii) Cornelius does not prove SambaSafety willfully violates § 1681, see RJMOL Memo at 19. According to SambaSafety, because Cornelius does not make the above showings, the jury does not have a legally sufficient basis to issue its verdict. See RJMOL Memo at 14.

**iv. Punitive Damages under § 1681e(b).**

SambaSafety asserts that the "punitive damages award with respect to the § 1681e(b)

claims also is contrary to the jury's factual findings." RJMOL Memo at 20. The factual findings are contradictory, according to SambaSafety, because the jury awards punitive damages "even though the jury factually found SambaSafety's violation was *not* willful." RJMOL Memo at 20 (emphasis RJMOL Memo). Because of this contradiction, SambaSafety argues that the damages "must be vacated in its entirety." RJMOL Memo at 20. SambaSafety notes that Cornelius omits the punitive damages award from the judgment she proposes, arguing this is a concession that the Court must vacate these damages. See RJMOL Memo at 20.

**b. Remittitur.**

In the RJMOL Motion, alternatively, SambaSafety requests "that the Court grant remittitur to reduce the jury's damages awards." RJMOL Motion at 1. SambaSafety argues that "the Court must significantly reduce the jury's awards under Rule 59(a) as excessive and unconstitutional." RJMOL Memo at 20. SambaSafety asserts remittitur is necessary, because: (i) the jury ignores the Court's instructions on mitigation, and the "evidence presented at trial conclusively established Plaintiff's clear failure to mitigate," RJMOL Memo at 21; and (ii) the damages are not reasonable nor proportionate to the amount of harm to Cornelius, and to the general damages she recovers, see RJMOL Memo at 23. Accordingly, SambaSafety concludes, because Cornelius' damages award is against the weight of the evidence and the award is unconstitutional, "relief under Rule 59(a) is also alternatively required." RJMOL Memo at 27.

**2. The Motion to Seal Memo.**

On March 25, 2026, SambaSafety files the Motion to Seal, see Motion to Seal at 1, and the Motion to Seal Memo, see Motion to Seal Memo at 1. In the Motion to Seal, SambaSafety requests that the Court enter a protective order to maintain trial exhibits J-19, J-20, J-22, J-23, and J-24 under seal (collectively "Confidential Materials"). Motion to Seal at 1. SambaSafety asserts that

its interests in keeping the Confidential Materials under seal outweighs the public's interest in accessing them. See Motion to Seal Memo at 2. SambaSafety makes four arguments how the Court should weigh the public's right of access and SambaSafety's interests in sealing the Confidential Materials. See Motion to Seal Memo at 2-6. First, SambaSafety alleges that "the Confidential Materials constitute SambaSafety's sensitive business information." Motion to Seal Memo at 2. According to SambaSafety, business information that might harm a litigant's competitive standing may overcome the presumption in favor of public access to judicial records. See Motion to Seal Memo at 2 ("'[A] party may overcome the presumption in favor of public access to judicial records by demonstrating the [portions of the record] contain sources of business information that might harm a litigant's competitive standing.'" (quoting Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 847 F.3d 1221, 1246 n.14 (10th Cir. 2017)(alterations in the original). Second, SambaSafety asserts that "none of the Confidential Materials are necessary for the public to understand the outcome of this case." Motion to Seal Memo at 5. Because the jury does not use the Confidential Materials, in adjudicating Cornelius' substantive legal rights, SambaSafety argues that the public's interest in access to these judicial records is less. See Motion to Seal Memo at 5 (citing Deherrera v. Decker Truck Line, Inc., 820 F.3d 1147, 1162 n.8 (10th Cir. 2016)). Third, SambaSafety asserts that "the documents should remain confidential because they were only published in limited ways, if at all." Motion to Seal Memo at 5. As an example, SambaSafety notes that Ex. J-19 "was never published to the jury *at all*, and Exhibits J-20, J-22, J-23, and J-24 were shown to the jury only in very limited part." Motion to Seal Memo at 5 (emphasis in Motion to Seal Memo). Fourth, SambaSafety argues that "the confidentiality designation for Exhibit J-19 is especially appropriate because it is a confidential contract with a nonparty, Uber." Motion to Seal Memo at 5. To support its position, SambaSafety asserts that the

interest in protecting sensitive business information is stronger "when disclosure 'could harm the competitive interests of third parties.'" Motion to Seal Memo at 6 (quoting Hershey v. ExxonMobil Oil Corp., 550 F. App'x 566, 574 (10th Cir. 2013))[3]. Finally, SambaSafety concludes by stating "there is no lesser means available that would sufficiently protect the business information of SambaSafety and Uber." Motion to Seal Memo at 6.

**3. The Motion to Seal Response.**

On April 8, 2026, Cornelius files the Motion to Seal Response. See Motion to Seal Response at 1. Cornelius asserts that the Court should not seal the Confidential Materials, because SambaSafety's request "runs contrary to the fundamental principle that judicial record are presumptively open to the public." Motion to Seal Response at 2. In support of this assertion, Cornelius makes two arguments. See Motion to Seal Response at 2-15. First, Cornelius argues that SambaSafety does not make the necessary showing to seal the documents, because SambaSafety "identifies general subjects rather than protectable specifics." Motion to Seal Response at 7. These general allusions, according to Cornelius, do not meet the United State Court of Appeals for the Tenth Circuits' heavy burden for depriving the public of access to judicial records. See Motion to Seal Response at 5-6 (citing JetAway Aviation, LLC v. Bd. of Cnty. Comm'rs of Cnty. of Montrose, Colo., 754 F.3d 824, 827 (10th Cir. 2014)). Cornelius continues by suggesting that SambaSafety "must 'undertake a case-by-case, document by-document, **line-by-line** balancing of the public's common law right of access against the interests favoring nondisclosure . . . .'" Motion to Seal Response at 14 (quoting Le v. Exeter Fin. Corp., 990 F.3d 410, 419 (5th Cir. 2021))(emphasis and alterations in the Motion to Seal Response and not in Le v. Exeter Fin. Corp.). Second, Cornelius attempts to rebut SambaSafety's assertion that the

3

Confidential Materials "are not necessary to understand the outcome in this case because the verdict did not 'specifically implicate' them." Motion to Seal Response at 14 (quoting Motion to Seal Memo at 5). Cornelius argues that how SambaSafety "standardizes data, prepares reports, reinvestigates disputes, and trains employees" is necessary to understand this cases' outcome, because the jury finds: (i) SambaSafety reports inaccurate or incomplete information; (ii) SambaSafety fails to follow reasonable procedures in preparing MVRs; (iii) SambaSafety fails to reinvestigate Cornelius' disputes; and (iv) SambaSafety causes Cornelius harm. Motion to Seal Response at 14. Cornelius concludes her arguments by stating that the public has "a vital interest in understanding how this case was tried, what evidence the jury heard, and why the jury found Samba liable." Motion to Seal Response at 16.

**4. <u>The RJMOL Motion Response</u>.**

On April 17, 2026, Cornelius files the RJMOL Response. <u>See</u> RJMOL Response at i. Cornelius argues that SambaSafety is not entitled to judgment as a matter of law, because: (i) SambaSafety reports inaccurate or incomplete information about Cornelius, <u>see</u> RJMOL Response at 3-7; (ii) trial evidence supports the jury's finding that SambaSafety violates § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy, <u>see</u> RJMOL Response at 8-11; and (iii) trial evidence supports the jury's finding that SambaSafety willfully violates § 1681i by repeatedly failing to reinvestigate Cornelius' disputes, <u>see</u> RJMOL Response at 11-15. Cornelius argues, moreover, that remittitur is not appropriate, because trial evidence supports the jury's damages award. <u>See</u> RJMOL Response at 15-24. Below, the Court briefly summarizes each of Cornelius' arguments.

**a. <u>Accuracy</u>.**

Cornelius argues that SambaSafety "reported inaccurate or incomplete information."

RJMOL Response at 2. As support, for her argument, Cornelius notes that the "Alaska DMV unambiguously testified, repeatedly, that Plaintiff always held a valid driver's license and non-commercial driving privileges." RJMOL Response at 3 (citing DMV Depo. at 19:5-20:10; id. at 25:12-22). SambaSafety reports to Uber, Inc., however, that Cornelius "'had a withdrawn license and had **no driving privileges**.'" RJMOL Response at 3 (quoting Isanaka Day Two Tr. at 82:4-7, and citing Isanaka Day Three Tr. at 6:1-8; id. at 7:22-9:16)(emphasis in RJMOL Response but not in the trial transcript). This difference, according to Cornelius, "[w]ether framed as factually inaccurate or materially misleading . . . easily supplied a legally sufficient evidentiary basis for the verdict." RJMOL Response at 6.

In addition to the DMV's testimony, Cornelius argues, the jury has reason to question Isanaka's credibility. See RJMOL Response at 6. According to Cornelius, the jury has reason to question Isanaka's credibility, because "Isanaka repeatedly testified that Samba does not 'interpret' DMV data, only 'translate[s]' it, and that interpretation and translation are opposite concepts." RJMOL Response at 6-7 (quoting Isanaka Day Two Tr. at 32:25-33:3, and citing Isanaka Day Two Tr. at 56:10-57:1; id. at 57:2-14; id. at 58:11-16; Isanaka Day Three Tr. at 9:20-25; id. at 10:1-3; id. at 10:11-14; id. at 10:15-18; id. at 18:22-19:1; id. at 19:2-6; id. at 20:10-16; id. at 20:17-19). Despite this testimony before the jury, Cornelius asserts, she is able to impeach Isanaka with "prior sworn testimony from another case in which he repeatedly said that Samba **does** interpret data." RJMOL Response at 7 (citing Isanaka Day Three Tr. at 23:1-14)(emphasis in RJMOL Response but not in trial transcript). Isanaka's credibility, in Cornelius' view, is important; because "Isanaka's testimony was the only evidence supporting Samba's claim that its reporting was accurate, the jury was entitled to reject that account." RJMOL Response at 6.

**b. The Reasonableness of the Procedures.**

Cornelius asserts that the trial record contains "ample evidence" to support the jury's verdict that SambaSafety does not follow reasonable procedures to assure maximum possible accuracy. RJMOL Response at 8. According to Cornelius, there is ample evidence for lack of reasonable procedures, because SambaSafety "did not simply 'pass through' Alaska DMV data." RJMOL Response at 9. Rather, Cornelius asserts that SambaSafety uses its own processes to interpret the Alaska DMV data and that interpretation is incorrect, which the trial record reflects. See RJMOL Response at 9. As support for her assertion that SambaSafety "did not simply transmit Alaska DMV data without alteration or interpretation," Cornelius notes topics in the record. RJMOL Response at 9-11. First, Cornelius points out that Isanaka testifies that SambaSafety creates a parent/child structure between the "Class A" section and the "Action" section in its JSON data that is not present in the DMV's XML data. RJMOL Response at 9 (citing Isanaka Day Two Tr. at 81:7-8; id. at 86:11-15; id. at 86:11-87:2; id. at 88:4; id. at 90:9; id. at 91:14-23; id. at 95:14-18; Isanaka Day Three Tr. at 10:23-11:3; id. at 31:20-23). The second topic which Cornelius highlights is that, when Checkr, Inc., SambaSafety's competitor, issues MVRs to Uber, Inc., Cornelius is able to continue driving without her medical certificate. See RJMOL Response at 10 ("Plaintiff passed background checks for the same Uber position through Checkr in 2022 and 2023, even though her medical certificate expired in April 2022." (citing Cornelius Day One Tr. at 15:4-16:5; id. at 16:23-18:8; Uber Depo. at 43:22-48:9)). Accordingly, Cornelius concludes, the "evidence permitted the jury to find instead that Samba used its own process to associate data across different sections of the XML, reached an unsupported conclusion about Plaintiff's license status, and reported that conclusion to Uber as if it were the DMV's own." RJMOL Response at 11.

**c. Liability Under 15 U.S.C. § 1681i.**

Cornelius asserts that the trial record contains "ample evidence" to support the jury's verdict that SambaSafety willfully violates § 1681i by repeatedly failing to reasonably reinvestigate Cornelius' disputes. RJMOL Response at 11. According to Cornelius, this ample evidence stands in contrast to SambaSafety's arguments that:

> (1) Samba did not have to reinvestigate Plaintiff's disputes because "Plaintiff failed to identify any specific 'items of information'" in her disputes; (2) Plaintiff's § 1681i claims accrued only after Plaintiff "failed in her duty to mitigate her claimed damages"; and (3) there was no evidence to support the jury's finding of willfulness.

RJMOL Response at 12 (quoting RJMOL Memo at 20)(footnote omitted). First, Cornelius cites Isanaka's testimony that SambaSafety knows what she is disputing. See RJMOL Response at 12 ("Isanaka **repeatedly** testified that the First Dispute clearly disputed Samba's reporting of her license status." (citing Isanaka Day Three Tr. at 71:18-21; id. at 79:5-9; id. at 86:21-87:5; SambaSafety Depo. at 125:9-25; id. at 162:2-14; id. at 163:9-11; id. at 165:1-8))(emphasis in RJMOL Response, but not in the trial transcript). Isanaka's testimony, according to Cornelius, undercuts any SambaSafety argument that Cornelius does not identify the items of information in dispute. See RJMOL Response at 12-13. Second, in response to SambaSafety's mitigation arguments, Cornelius asserts that she "attempted to mitigate by **twice** disputing" the accuracy of SambaSafety's MVRs and that, if SambaSafety conducts a reasonable reinvestigation, she "could have resumed driving in June 2024." RJMOL Response at 17-18 (citing J-15; J-16). Finally, Cornelius explains that the jury hears evidence that: (i) her disputes are "clear"; (ii) SambaSafety knows "what she was disputing" in Dispute One and Dispute Two; (iii) SambaSafety's "training required a good-faith effort to determine the accuracy of the disputed information"; and (iv) SambaSafety fails to "reinvestigate either dispute while changing its explanations for that failure." RJMOL Response at 15. This evidence, according to Cornelius, is enough for the jury to find that

SambaSafety acts either knowingly or with reckless disregard for her consumer rights. See RJMOL Response at 14-15.

**d. Remittitur.**

Cornelius asserts that Remittitur is improper, because the evidentiary record "amply" supports the jury's damages. See RJMOL Response at 15. In support of her assertion, Cornelius cites evidence for: (i) her emotional distress, see RJMOL Response at 16-17; (ii) her mitigation efforts, see RJMOL Response at 17-18; and (iii) the reprehensibility of SambaSafety's conduct, see RJMOL Response at 19-21. First, Cornelius states that she testifies: "that Samba's FCRA violations left her 'dumbfounded, shocked, surprised,' 'frustrated,' 'lost' and 'confused'; caused headaches, sleeplessness, and depression; made her unable to pay bills and forced her to ask her adult son for money; and caused her to lose enjoyment in daily life and hobbies." RJMOL Response at 17 (quoting Cornelius Day One Tr. at 25:6-25; id. at 34:23-35:4; id. at 50:13-16; id. at 56:20-57:21; id. at 64:11-65:15). Second, she points to evidence that she earns "approximately $40,000 from Uber in 2023." RJMOL Response at 17 (citing Cornelius Day One Tr. at 58:22-59:1; Cornelius Day Two Tr. at 3:20-4:3). This testimony, along with the evidence that Cornelius files Dispute One and Dispute Two with SambaSafety, in Cornelius' view, entitles the jury to "to reject Samba's assertion that Plaintiff in any way failed to mitigate her damages." RJMOL Response at 18. Moreover, she continues, stating that SambaSafety's "theory" that she can start working as soon as May 29, 2024, "is speculative," because it assumes SambaSafety "would have correctly reported her status to Uber," Inc. RJMOL Response at 18. Finally, Cornelius notes "that Samba claimed FCRA compliance was important, maintained a compliance department dedicated to consumer disputes, and trained its personnel on FCRA obligations," RJMOL Response at 21 (citing Tavernier Day Three Tr. at 6:2-24), "and nevertheless **chose** not to provide Plaintiff the

meaningful dispute and reinvestigation process required by the FCRA," RJMOL Response at 21 (emphasis in RJMOL Response). For these reasons, Cornelius asserts that Remittitur is improper. See RJMOL Response at 15.

**5. The Motion to Seal Reply.**

On April 22, 2026, SambaSafety files the Motion to Seal Reply. See Motion to Seal Reply at 1. In the Motion to Seal Reply, SambaSafety argues that the Tenth Circuit does not require a "phrase-by-phrase detail of each portion of the exhibits" and proof "that competitive harm would be certain in the event" that the Court does not seal the Confidential Materials. Motion to Seal Reply at 2 (citing Motion to Seal Response at 7-8). Instead, according to SambaSafety, to seal judicial documents "a party must provide the Court enough information to determine whether disclosure 'may disadvantage the requesting parties' business interests unfairly.'" Motion to Seal Reply at 5 (quoting In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices and Antitrust Litig., No. 17-MD-2785-DDC-TJJ, 2019 WL 2357374, at *2 (D. Kan. June 4, 2019)(Crabtree, J.)). SambaSafety asserts that it meets this standard, because "SambaSafety's declarations explained in detail what each exhibit contains (on a document specific basis), why it is confidential, and how it would cause competitive harm." Motion to Seal Reply at 6. Moreover, SambaSafety continues, "'the public's interest in' the Confidential Materials is lessened here because they are not necessary for the public to understand the outcome of the litigation." Motion to Seal Reply at 8 (quoting Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 847 F.3d at 1246 n.14). According to SambaSafety, the public's interest in the Confidential Materials is less, because they "were introduced in highly limited ways (if at all) at trial." Motion to Seal Reply at 8. Finally, SambaSafety requests "that it be permitted to offer proposed redactions to the Court to redact all materials except those that were the subject of testimony." Motion to Seal Reply at 12 (citing Luo

v. Wang, 71 F.4th 1289, 1305 (10th Cir. 2023)).

**6. The RJMOL Reply.**

On May 14, 2026, SambaSafety files the RJMOL Reply. See RJMOL Reply at 1. In the RJMOL Reply, SambaSafety makes five arguments why "no reasonable jury could find an inaccuracy, unreasonable procedures, or that SambaSafety caused Plaintiff's alleged damages, let alone that any violation was 'willful.'" RJMOL Reply at 1-13. First, regarding accuracy, SambaSafety asserts that the "Alaska DMV reported a 2022 withdrawal of Plaintiff's Class A CDL due to her expired medical certificate, and SambaSafety reported the same thing," RJMOL Reply at 2, and its "MVRs speak for themselves," RJMOL at 3 n.1. According to SambaSafety, the MVRs do not report on Cornelius' driving privileges. See RJMOL Reply at 3. Moreover, because SambaSafety reports only what it receives from the DMV, SambaSafety argues, the MVRs cannot be misleading. See RJMOL Reply at 3. That result is, because, according to SambaSafety, it does "not have a duty to interpret or explain" public records from an official government source. RJMOL at 3. SambaSafety continues by stating, moreover, that Uber, Inc. "requested that SambaSafety provide the Alaska DMV's records," and "expected SambaSafety to provide the Alaska DMV records without alteration or interpretation." RJMOL Reply at 3 (citing Uber Depo. at 74:20-25; id. at 75:1-8; id. at 75:20-76:1.). Finally, SambaSafety argues that the issue of Isanaka's credibility "is misplaced and irrelevant, because his testimony was not 'the only evidence supporting Samba's claim that its reporting was accurate.'" RJMOL Reply at 4 (quoting RJMOL Response at 6). According to SambaSafety, the "documented contents of the Alaska DMV data and SambaSafety's MVRs -- which frame the relevant 'objective' inquiry -- speak for themselves." RJMOL Reply at 4 (quoting Erickson v. First Advantage Background Servs. Corp., 981 F.3d 1246, 1252-53 (11th Cir. 2020)).

Second, SambaSafety argues that "its procedures are indisputably reasonable." RJMOL Reply at 4. That conclusion is, because, according to SambaSafety, Tenth Circuit authority holds "that when 'a consumer reporting agency accurately transcribes, stores and communicates consumer information received from a source that it reasonably believes to be reputable, and which is credible on its face, the agency does not violate' the FCRA as a matter of law." RJMOL at 4 (quoting Cassara, 276 F.3d at 1217, and Wright, 805 F.3d at 1240). Cornelius' argument that SambaSafety "did not merely 'pass through' Alaska DMV data" is, in SambaSafety's view, contrary to the evidence. RJMOL Reply at 5 (quoting RJMOL Response at 9, 11). Accordingly, SambaSafety argues that the relevant evidence precludes the jury's verdict, because the "Plaintiff's counsel's questions to SambaSafety's witness and the semantic arguments about technical JSON 'parent/child' data structures within what SambaSafety reported successfully confused the jury, but they do not support a judgment contrary to the evidence." RJMOL Reply at 5 (citing ClearPlay, Inc. v. Dish Network L.L.C., No. CIV 14-0191 DN/CMR, 2023 WL 3805596 (D. Utah June 2, 2023)(Nuffer, J.), aff'd, No. 2023-2134, 2026 WL 1464759 (Fed. Cir. May 26, 2026)).

Third, SambaSafety reasserts that Cornelius does not identify "the specific 'item[s] of information' she claims to be inaccurate or incomplete in her 'file.'" RJMOL Reply at 5-6 (quoting 15 U.S.C. §§ 1681i(a)(1), (3))(alterations in RJMOL Reply). That omission is, because, according to SambaSafety, the FCRA assesses § 1681i's consumer burden "in an 'objective light.'" RJMOL Reply at 5-6 (quoting Minkowitz v. TransUnion, LLC, No. 21-CV-62426, 2022 U.S. Dist. LEXIS 162222, at *7 (S.D. Fla. Sep. 8, 2022)(Valle, J.)). Objectively, SambaSafety argues, the Dispute One and Dispute Two show that Cornelius does not identify "any item of information." RJMOL Reply at 6. See RJMOL Reply at 6 n.4 (asserting that Cornelius' "vague 'status' notation did not identify any *item* of reported information that Plaintiff claimed was incorrect")(emphasis in

RJMOL Reply). According to SambaSafety, what Isanaka "subjectively understood Plaintiff was disputing" is irrelevant to the inquiry. RJMOL Reply at 6.

Fourth, SambaSafety reasserts that "there was no sufficient evidentiary basis to support a 'willful' violation of § 1681i(a)." RJMOL Reply at 6-7. That is because, according to SambaSafety, the Supreme Court in Safeco holds "a defendant's conduct cannot be a willful violation of the FCRA if it is supported by an interpretation of the statutory language that is not 'objectively unreasonable.'" RJMOL Reply at 7 (quoting Safeco, 551 U.S. at 69-70). SambaSafety asserts that its interpretation of Cornelius' burden to identify an item of information is objectively unreasonable. See RJMOL Reply at 7. Instead, of grappling with this standard, SambaSafety argues that Cornelius "boldly asserts authority is not required 'where the statute is "far too clear."'" RJMOL Reply at 7 (quoting RJMOL Response at 14 (quoting Seamans v. Temple Univ., 744 F.3d 853, 868 (3d Cir. 2014))).

Fifth, SambaSafety reasserts that Cornelius "failed to mitigate her damages, which also precludes her award of damages, including any damages at all under § 1681i(a)." RJMOL Reply at 7. That Cornelius fails to mitigate her damages is "undisputed," according to SambaSafety. RJMOL reply at 7-8. In reply to Cornelius' argument that she mitigates damages by filing Dispute One and Dispute Two, SambaSafety asserts that "the law required Plaintiff to take any reasonable steps to mitigate her damages vis-à-vis her employer independent of her also beginning the entirely separate FCRA dispute process." RJMOL Reply at 8 (citing Giandonato v. Sybron Corp., 804 F.2d 120, 123 (10th Cir. 1986)). As for Cornelius' speculation argument, furthermore, SambaSafety argues that "trial evidence conclusively established SambaSafety's systems are directly integrated with the Alaska DMV's and will always report the current DMV record to Uber, including as that DMV record existed on May 29, 2024." RJMOL Reply at 8 (citing Isanaka Day

Two Tr. at 41:15-25.). Accordingly, SambaSafety concludes, "she cannot recover damages after May 29, 2024, at which time she had lost (at most) $769 in wages." RJMOL Reply at 8.

Finally, SambaSafety makes one argument for remittitur of the punitive damages. See RJMOL Reply at 9-12. SambaSafety argues that, "[e]ven if Plaintiff could meet *Safeco*'s high bar to prove a willful violation, the punitive damages award was legally unsupportable and plainly excessive in view of the trial record." RJMOL Reply at 9. The punitive damages award, according to SambaSafety, is legally unsupportable, because "*none* of the Supreme Court's *State Farm* factors for assessing 'reprehensibility' are present here." RJMOL Reply at 9 (quoting RJMOL Memo at 24-25)(emphasis in RJMOL Reply). SambaSafety argues that, to avoid this conclusion, she "claims the first two factors (physical harm and reckless disregard of health/safety) are not relevant in FCRA cases and can be ignored." RJMOL Reply at 9 (citing RJMOL Response at 20). As for the other three factors, SambaSafety argues, Cornelius' arguments fail, because: (i) the "'financial vulnerability' Plaintiff identified is a loss of income caused by her own failure to seek alternate employment," RJMOL Reply at 10; (ii) the Supreme Court interprets the "repeated" factor to require that "'the similar reprehensible conduct be committed against various different parties,'" notwithstanding the jury's potential consideration of the two MVRs as "repeated," RJMOL Reply at 10 (quoting Bach v. First Union Nat. Bank, 149 F. App'x 354, 365 (6th Cir. 2005)); and (iii) Cornelius "offers no serious argument SambaSafety engaged in intentional malice, trickery, or deceit, other than citing the fact that it maintains a dedicated compliance team and trains its personnel on FCRA compliance," RJMOL Reply at 10 (citing RJMOL Response at 21). As for plainly excessive, SambaSafety argues that, because Cornelius does not "mitigate her damages . . . she suffered no damages *at all* for her § 1681i claim," which is the only claim the jury finds SambaSafety willfully commits. RJMOL Reply at 10 (emphasis in RJMOL Reply).

Even taking into consideration the "$40,000 compensatory damages award for § 1681i," the punitive damages award, according to SambaSafety, is still more than a "10:1 ratio." RJMOL Reply at 11. Accordingly, SambaSafety concludes, "no award of punitive damages was appropriate here, let alone a 10:1 ratio." RMOL Reply at 12.

## ANALYSIS

Before the Court are SambaSafety's RJMOL Motion and Motion to Seal. The factual dispute underlying this case is, in one sense, straightforward. The parties do not disagree about what information the Alaska DMV maintains in its records. Rather, the dispute arises from what the Alaska DMV's information communicates after a series of intermediary transfers and translations of that information -- from the Alaska DMV's records, to SambaSafety's reporting system, and ultimately to Uber, Inc.'s decision-making process. The evidence the parties present at trial permits the conclusion that SambaSafety and Uber, Inc., at each stage, understand and convey the same underlying data differently than what the Alaska DMV understands the data to mean. The case illustrates a challenge in an increasingly automated world -- data may remain unchanged while the information's meaning becomes obscured as it moves through various automated systems and autonomous processes.

With that framework in mind, the Court makes five conclusions regarding the RJMOL Motion. First, SambaSafety is not entitled to judgment as a matter of law on the issue of accuracy, because there is a legally sufficient evidentiary basis for the jury to conclude that SambaSafety does not interpret accurately the official government record concerning Cornelius' driving privileges. Second, SambaSafety is not entitled to judgment as a matter of law on the issue of reasonable procedures to ensure maximum possible accuracy, because there is a legally sufficient evidentiary basis for the jury to conclude that SambaSafety's procedures do not ensure maximum

possible accuracy where SambaSafety's MVRs do not contain the complete official government record. Third, SambaSafety is not entitled to judgment as a matter of law on the issue of liability under 15 U.S.C. § 1681i, because the jury's verdict rests on a legally sufficient evidentiary basis to conclude Conelius provides SambaSafety enough information for it to investigate the information she disputes. Finally, remittitur is not appropriate, because the Court concludes a punitive damages ratio of five-to-one does not violate SambaSafety's right to due process. Accordingly, the Court denies the RJMOL Motion. Regarding the Motion to Seal, the Court reaches two conclusions. First, the Court concludes that continuing to seal the Confidential Materials is not appropriate, because SambaSafety does not demonstrate sufficient justification to overcome the common-law right of access to judicial records.

The Court discusses below, in turn, the reasons supporting these conclusions. Before addressing the merits, however, the Court resolves a procedural issue that SambaSafety raises in the RJMOL Motion. See RJMOL Memo at 1 n.1. During trial, SambaSafety moves for judgment as a matter of law pursuant to rule 50(a) of the Federal Rules of Civil Procedure. See Day Four Tr. at 1:21-25 (St. George)("We would move under Rule 50 for judgment as a matter of law at this stage in the proceedings on two grounds."); Bench Memo. At that time, the Court takes that motion "under advisement." Day Four Tr. at 22:5-6 (Court). SambaSafety now contends that its rule 50(a) motion "remain[s] pending." RJMOL Memo at 1 n.1.

## I. SAMBASAFETY'S RULE 50(a) MOTION DOES NOT REMAIN PENDING.

Before addressing the substantive issues that the RJMOL Memo raises, the Court first resolves a procedural matter concerning the posture of SambaSafety's request for judgment as a matter of law. Although SambaSafety challenges the § 1681's accuracy element in both its rule 50(a) motion and its RJMOL Memo, the evidentiary basis for its motions is not identical. At the

rule 50(a) stage, SambaSafety focuses primarily on the evidence as it exists at the summary judgment stage. See RJMOL Memo at 9 (stating that Cornelius never presents to the jury the accuracy issue on which the Court denies summary (citing Order at 99-100)). The evidence before the Court at the rule 50(a) stage, however, is different than the evidence at the summary judgment stage. The jury hears testimony -- including from SambaSafety's own expert witnesses' testimony -- from which it could evaluate whether SambaSafety accurately interprets and conveys information concerning Cornelius' driving privileges. See RJMOL Reply at 5 (acknowledging that Isanaka's testimony "confused" the jury). Consequently, the Court's task is not to determine whether the evidence supporting SambaSafety's rule 50(a) motion remains persuasive. Rather, the Court must determine whether, viewing the trial record as a whole and drawing all reasonable inferences in Cornelius' favor, a legally sufficient evidentiary basis supports the jury's verdict. See Bay v. Anadarko E&P Onshore LLC, 73 F.4th 1207, 1215 (10th Cir. 2023)("'Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position.'" (quoting Escue v. N. Okla. Coll., 450 F.3d 1146, 1156 (10th Cir. 2006))). Because much of this case turns on how the Alaska DMV, SambaSafety, and Uber, Inc. interpret and convey information and data amongst themselves, the Court must first determine which motion is properly before it and what standard the Court must use.

Rule 50(a) of the Federal Rules of Civil Procedure provides for judgment as a matter of law. The rule states:

> **(a) Judgment as a Matter of Law.**
>
> (1) In *General*. If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

> (A) resolve the issue against the party; and
>
> (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
>
> (2) *Motion*. A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury. The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

Fed. R. Civ. P. 50(a). In contrast, rule50(b) states:

> **Renewing the Motion After Trial; Alternative Motion for a New Trial.** If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment -- or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged -- the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
>
> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

Fed. R. Civ. P. 50(b).

The Court agrees with Cornelius that the "text of the Rule . . . makes clear that" SambaSafety's rule 50(a) motion does not remain pending. RJMOL Response at i n.1. Rule 50(b) expressly contemplates that, when a court does not grant a rule 50(a) motion before submission of the case to the jury, the action is deemed submitted to the jury subject to later judicial review of the legal questions raised in that motion. See Fed. R. Civ. P. 50. The Supreme Court explains: "A court is always 'deemed to have submitted the action to the jury subject to a later determination' of the right to a direct verdict if a motion for judgment notwithstanding the verdict is made 'Within

10 days after the reception of a verdict . . . .'" Johnson v. New York, N.H. & H.R. Co., 344 U.S. 48, 53 (1952)(quoting Fed. R. Civ. P. 50(b)). Here, the Court takes SambaSafety's rule 50(a) motion under advisement rather than granting the motion before the Court submits the case to the jury. Once the jury returns its verdict and SambaSafety files its renewed motion pursuant to rule 50(b), the operative motion before the Court becomes the RJMOL Motion. Accordingly, the Court denies the Bench Memo and concludes that SambaSafety's rule 50(a) motion no longer remains pending. The Court therefore addresses the merits of the RJMOL Motion under rule 50(b).

SambaSafety argues that the jury does not have a legally sufficient evidentiary basis to find for Cornelius, because "the evidence entitling SambaSafety to judgment as a matter of law on the accuracy of its reporting, the reasonableness of its procedures, and its dispute handling is well documented." RJMOL Memo at 1. To prevail on a claim under § 1681e(b), "a plaintiff must 'establish that: (1) [the CRA] failed to follow reasonable procedures to assure the accuracy of its reports; (2) the report in question was, in fact, inaccurate; (3) [the plaintiff] suffered injury; and (4) [the CRA's] failure caused his injury." Wright, 805 F.3d at 1239 (quoting Eller v. Trans Union, LLC, 739 F.3d 467, 473 (10th Cir.2013), cert. denied, Eller v. Trans Union, LLC, 572 U.S. 1101 (2014)).

## II. SAMBASAFETY IS NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE ISSUE OF ACCURACY, BECAUSE THERE IS A LEGALLY SUFFICENT EVIDENTIARY BASIS FOR THE JURY TO CONCLUDE THAT SAMBASAFETY DOES NOT INTERPRET ACCURATELY THE OFFICAL GOVERNMENT RECORD CONCERNING CORNELIUS' DRIVING PRIVILEGES.

Judgment as a matter of law is proper where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). This standard for a directed verdict mirrors the standard for summary judgment. See Anderson v. Liberty Lobby, 477

U.S. 242, 250 (1986)("[T]his [rule 56] standard mirrors the standard for directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." (citing Brady v. S. Ry. Co., 320 U.S. 476, 479-80 (1943))); Wiles v. Michelin No. America, Inc., 173 F.3d 1297, 1303 (10th Cir. 1999)("We review the district court's ruling on a motion for JMOL under a standard that is essentially identical to the 'genuine issue' requirement in the summary judgment context." (citing Pendleton v. Conoco Inc., 23 F.3d 281, 286 (10th Cir.1994))). A court may grant judgment as a matter of law, however, even though it has denied summary judgment, because the parties have been able to address all relevant, available evidence. See Evanston Ins. Co. v. Desert State Life Mgmt., 484 F. Supp. 3d 987, 1036 (D.N.M. 2020)(Browning, J.)(citing Lee v. Glessing, 51 F. App'x 31, 32 (2d Cir. 2002)), aff'd in part, rev'd in part and remanded on other ground, 56 F.4th 899 (10th Cir. 2022).

In determining whether to grant judgment as a matter of law, a court may not weigh the evidence or make its own credibility determination, see Shaw v. AAA Eng'g. & Drafting, 213 F.3d 519, 529 (10th Cir. 2000), and must draw all reasonable inferences in the nonmoving party's favor, see Thompson v. State Farm Fire & Cas. Co., 34 F.3d 932, 941 (10th Cir. 1994). Such a judgment is appropriate if the evidence permits only one rational conclusion. See Crumpacker v. Kan. Dep't of Human Res., 474 F.3d 747, 751 (10th Cir. 2007). In other words, "'[t]he question is not whether there is literally no evidence supporting the [nonmoving] party . . . but whether there is evidence upon which the jury could properly find [for that party].'" Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp., 315 F.3d 1271, 1278 (10th Cir. 2003)(quoting Hurd v. Am. Hoist & Derrick Co., 734 F.2d 495, 499 (10th Cir. 1984)(alterations Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp. but not in Hurd v. Am. Hoist & Derrick Co.). In the Tenth Circuit, "'[j]udgment as a matter

of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position.'" Bay v. Anadarko E&P Onshore LLC, 73 F.4th 1207, 1215 (10th Cir. 2023)(quoting Escue v. N. Okla. Coll., 450 F.3d 1146, 1156 (10th Cir. 2006)). Accordingly, district courts "'draw all inferences from the evidence in favor of the nonmoving party, and do not weigh the evidence or judge witness credibility.'" Bay v. Anadarko E&P Onshore LLC, 73 F.4th at 1215 (quoting Henry v. Storey, 658 F.3d 1235, 1238 (10th Cir. 2011)).

### A. THE COURT'S SUMMARY JUDGMENT ANALYSIS DOES NOT CONTROL ITS RULE 50 DETERMINATION.

The Court's analysis at the summary judgment stage does not control its analysis on a motion for judgment as a matter of law. SambaSafety first argues that, with respect to accuracy, "the triable issue the Court identified at summary judgment as precluding judgment in SambaSafety's favor was waived," because Cornelius does not present certain arguments to the jury. RJMOL Memo at 9. That argument misconstrues the relationship between summary judgment and trial. As the Court explains above, the factual issues sufficient to preclude summary judgment need not be necessarily the same factual issues that preclude judgment as a matter of law following a full trial. Indeed, the Supreme Court explains: "Trials wholly supplant pretrial factual rulings." Dupree v. Younger, 598 U.S. 729, 735 (2023). For that reason, "[o]nce the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion." Ortiz v. Jordan, 562 U.S. 180, 184 (2011).

The Court therefore bases its evaluation of the RJMOL Motion on the evidentiary record that the parties present at trial rather than on the record that exists at summary judgment. At summary judgment, the Court concludes that a genuine dispute of material fact exists, because SambaSafety includes information in the MVRs that it provides to Uber, Inc., which does not

appear in the Alaska DMV records. See Order at 99 ("Here, there is a fact question as to whether SambaSafety 'accurately' transcribes the DMV's data, but it is undisputed that the phrase 'license status failed' does not come from the Alaska DMV."). The trial record, however, presents two different evidentiary bases for denying judgment as a matter of law. First, SambaSafety's expert testifies that SambaSafety reports to Uber, Inc. that Cornelius "'had a withdrawn license and had no driving privileges.'" RJMOL Response at 3 (quoting Isanaka Day Two Tr. at 82:4-7 and citing Isanaka Day Three Tr. at 6:1-8). This report is factually inaccurate, because the record is clear that Cornelius always maintains non-commercial driving privileges. See RJMOL Response at 3 ("The Alaska DMV unambiguously testified, repeatedly, that Plaintiff always held a valid driver's license and non-commercial driving privileges."). Second, SambaSafety does not merely translate Alaska DMV data, but also interprets that data before transmitting it to Uber, Inc. See RJMOL Response at 7 (stating that SambaSafety's corporate representative "was then impeached with prior sworn testimony from another case in which he repeatedly said that Samba does interpret data" (citing Isanaka Day Three Tr. at 23:1-14; id. at 23:24-24:15; id. at 25:8-19; id. at 28:5-20)). That testimony, alongside the evidence that SambaSafety's competitor, Checkr, Inc., communicates similar Alaska DMV information to Uber, Inc. without Cornelius losing her position, permits a reasonable jury to infer that SambaSafety's interpretation does not accurately reflect the Alaska DMV records. See RJMOL Response at 10 ("When Plaintiff re-applied to drive with Uber in 2025, she was again screened through Checkr and was able to resume driving for Uber." (citing Cornelius Day Two Tr. 26:19-24)).

Accordingly, drawing all reasonable inferences in Cornelius' favor, the Court concludes that judgment as a matter of law is not appropriate. Although the factual basis supporting the Court's ruling differs from the factual dispute the Court identifies at summary judgment, the trial

evidence nevertheless provides a legally sufficient basis upon which a reasonable jury could conclude that SambaSafety's MVRs are inaccurate.

**B. THE TRIAL EVIDENCE IS SUSCEPITABLE TO MORE THAN ONE INTERPRETATION ON THE ISSUE OF ACCURACY.**

The trial evidence does not establish conclusively that SambaSafety's MVR completely and accurately reflects the Alaska DMV's driving record for Cornelius' Class A and Class D licenses. Although SambaSafety's expert witness testifies that SambaSafety reports Cornelius does not have driving privileges and that SambaSafety sometimes does not merely report the information it receives from DMVs, SambaSafety contends that the information it transmits to Uber, Inc. is the "same thing" as the raw data SambaSafety receives from the Alaska DMV. RJMOL Memo at 10. According to SambaSafety, because SambaSafety reports the "same content," the MVR is accurate as a matter of law. RJMOL Memo at 10. That argument overlooks a FCRA fundamental principle: information may be technically accurate yet misleading, and therefore "incomplete or inaccurate," within the statute's meaning.

The Tenth Circuit states:

> [A]s several of our sister circuits have explained, the FCRA's requirement that furnishers of information correct "incomplete or inaccurate" information, 15 U.S.C. § 1681s-2(b)(1)(D), extends not only to false information, which "is clearly inaccurate," but to information provided "in such a manner as to create a materially misleading impression" as well.

Llewellyn v. Allstate Home Loans, Inc., 711 F.3d at 1186 (quoting Boggio v. USAA Fed. Sav. Bank, 696 F.3d 611, 617 (6th Cir. 2012)). See Saunders v. Branch Banking & Trust Co., 526 F.3d at 148 ("[A] consumer report that contains technically accurate information may be deemed 'inaccurate' if the statement is presented in such a way that it creates a misleading impression."); Gorman v. Wolpoff & Abramson, LLP, 584 F.3d at 1163 (holding that a credit report may be deemed "'incomplete or inaccurate' within the meaning of the FCRA 'because it is

patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions'" (quoting Sepulvado v. CSC Credit Servs., 158 F.3d 890, 895 (5th Cir. 1998))). An accurate statement may be misleading if the reader reasonably can interpret the report in an inaccurate, adverse manner. See Dalton v. Capital Assoc'd Indus., Inc., 257 F.3d 409, 415-16 (4th Cir. 2001)(finding a genuine issue of material fact exists regarding the accuracy of a plaintiff's credit report where a jury could reasonably interpret the report as indicating that the plaintiff is a convicted felon, although the plaintiff had pled guilty to a misdemeanor); Pinner v. Schmidt, 805 F.2d 1258, 1262-63 (5th Cir. 1986)(finding that the statement "litigation pending" on a plaintiff's credit report could have been interpreted as indicating that a furnisher brought a suit against the plaintiff, when the reverse is accurate). Some courts note that whether credit information is materially misleading is a question for the fact finder. See, e.g., Gorman v. Wolpoff & Abramson, LLP, 584 F.3d at 1163 ("The consumer must still convince the finder of fact that the omission of the dispute was 'misleading in such a way and to such an extent that [it] can be expected to have an adverse effect.'" (quoting Saunders v. Branch Banking & Trust Co., 526 F.3d at 150)); Krajewski v. Am. Honda Fin. Corp., 557 F. Supp. 2d 596, 615 (E.D. Pa. 2008)(finding that whether a credit report was accurate depended on the meaning of "repossession" as used in the report and, given the definitions of repossession, a reasonable jury could conclude that the CRA's reporting could be so misleading as to be inaccurate).

Here, Cornelius presents sufficient evidence for the jury to conclude that SambaSafety's MVR creates a misleading impression, notwithstanding SambaSafety's assertion that it reports the

same information that the Alaska DMV's data contains. SambaSafety relies upon the Ex. D-04, seen below:

| Alaska DMV Data Sent to SambaSafety | SambaSafety MVR Data Sent to Uber |
|---|---|
| <CLASS_CODE>D | "classCode": "D" |
| <ISSUE_DATE>2007-06-08 | "issueDate": "2007-06-08" |
| <EXPIRATION_DATE>2009-10-23 | "expirationDate": 2009-10-23 |
| <CLASS_CODE>A | "classCode": "A" |
| <ISSUE_DATE>2019-05-15 | "issueDate": "2019-05-15" |
| <ACTION_WITHDRAWL_REASON_DESC >EXPIRED MED CERT | "name": "WITHDRAWN" "explanation": "NON-COMPLIANCE" "description": "EXPIRED MEDICAL CERTIFICATE" |
| <VIOLATION_DATE>2022-03-12 | "offenseDate": "2022-03-12" |
| <EFFECTIVE_DATE>2022-04-12 | "date": "2022-04-12" |

Ex. D-04. This chart presents the Alaska DMV's XML data alongside SambaSafety's JSNO data in a format that appears to support its assertion that "SambaSafety reported the same content." RJMOL Memo at 10.

Ex. D-04, in isolation, lends support to SambaSafety's position. The jury, however, does not evaluate Ex. D-04 in isolation. Rather, the jury evaluates Ex. D-04 alongside testimony explaining how SambaSafety transforms the Alaska DMV's XML data before transmitting it to Uber, Inc. Specifically, SambaSafety's concedes that, through its parent-child structure, SambaSafety creates a relationship within the MVR's JSON data that does not exist in the Alaska DMV's XML data. See RJMOL Response at 4 (referring to the SambaSafety's testimony " the Class A and Actions section were 'different section[s] of the report,' that nothing in the Class A section referred to 'withdrawn, withdrawal, medical certificate expired, nothing like that,' and that nothing in the Actions section referred to the Class A section" (quoting Isanaka Day Two Tr. at 86:11-87:2; id. at 88:4-90:9; id. at 91:14-23; id. at 95:14-18)(alterations in the RJMOL Response)).

Although SambaSafety correctly asserts that the "withdrawal" applies to Cornelius' Class A commercial license, a reasonable jury could conclude that the MVR misleadingly omits that the non-commercial driving privileges associated with the Class A license remain valid. The jury could reasonably infer that, by linking the withdrawal to Cornelius' Class A License without expressly distinguishing between her commercial and non-commercial driving privileges, the MVR conveys the misleading impression that Cornelius does not possess valid driving privileges whatsoever. See RJMOL Response at 4-5 ("Samba reported she had no valid driver's license and no driving privileges; Uber understood the report exactly that way."). The FCRA does not require a report to be false before it becomes inaccurate. That the report communicates accurate information in a manner that creates a materially misleading impression is enough. See Fishback v. HSBC Retail Servs. Inc., 944 F. Supp. 2d 1098, 1110 (D.N.M. 2013)(Browning, J.)("An accurate statement may be misleading if it can reasonably be interpreted in an inaccurate, adverse manner."). Consequently, the jury may conclude that SambaSafety's reporting is inaccurate notwithstanding the appearance of accuracy in the underlying data. The Court discusses below why the data is misleading.

### C. SAMBASAFETY'S MVRS ARE MISLEADING, BECAUSE THE JURY MAY INFER SAMBASAFETY WRONGLY INTEPRETS PUBLIC RECORDS, CREATING A MISLEADING IMPRESSION.

The trial record permits a reasonable jury to conclude that SambaSafety does more than merely transmit the Alaska DMV's records. SambaSafety argues that the MVRs cannot be misleading, because "reporting public records from the official government source is accurate as a matter of law, and that defendants do not have a duty to interpret or explain such records." RJMOL Reply at 3. That argument assumes, however, that the Alaska DMV's data retains the same meaning as it passes from the Alaska DMV's database, through SambaSafety's reporting

APIs, and ultimately to Uber, Inc. The trial evidence does not compel that conclusion alone.

The Court views this as the case's central dispute. Although the parties devote considerable attention to competing legal theories concerning accuracy and what is misleading, those arguments reduce to a single issue: whether data, or information, loses meaning, acquires meaning, or otherwise changes meaning as it passes through successive automated systems before reaching the end user. Within the Alaska DMV's data there is ambiguity, without question. Congress anticipates, however, that CRAs will transmit imperfect or ambiguous information. Anticipating that possibility, Congress burdens the CRAs, not to the originating entities, with the obligation to assure the maximum possible accuracy of the reports concerning consumers. See Safeco, 551 U.S. at 52.

Viewed in the light most favorable to Cornelius, the trial evidence permits a reasonable jury to conclude that SambaSafety does not meet this burden, because the MVRs are misleading. SambaSafety argues that it perfectly extracts the Alaska DMV's data and transmits the "same content" to Uber, Inc. RJMOL Memo at 10. A reasonable jury could accept that narrative. The jury also heard evidence, however, supporting a different narrative of the events. SambaSafety's own witness testifies that its system does more than simply convert the Alaska DMV's XML data into JSON format. See Isanaka Day Two Tr. at 86:11-87:2; id. at 88:4-90:9; id. at 91:14-23; id. at 95:14-18. Rather, SambaSafety employs a parent-child structure that creates associations within the JSON data that are not present in the underlying Alaska DMV's XML data. See Isanaka Day Two Tr. at 81:7-8; id. at 86:11-15. From that testimony, the jury can reasonably infer that SambaSafety modifies the Alaska DMV's data rather than perfectly transmitting it. Although subtle, that SambaSafety potentially modifies the data is significant. See RJMOL Memo at 11 (stating that a report can be misleading "when the CRA modified reporting to present a misleading

impression" (citing Hawkins v. S2Verify LLC, No. C 15-03502 WHA, 2016 WL 107197, at *2-3 (N.D. Cal. Jan. 11, 2016)(Alsup, J))).

The Alaska DMV consistently maintains that Cornelius retains non-commercial driving privileges and a valid non-commercial license notwithstanding the withdrawal on her record. See DMV Depo. at 25:21-22 ("She has, per our records, has always had a valid non-commercial license."). Yet the jury hears evidence that Uber, Inc. understands SambaSafety's MVR to mean the opposite -- Cornelius lacks an active driver's license altogether. See Uber Depo. at 35:6-12; id. at 53:8-24 (confirming that Uber, Inc. understands from the MVRs that Cornelius "did not have a valid driver's license" or "did not have any driving privileges"). The jury also hears evidence that Uber, Inc. reaches a different conclusion when it receives MVRs concerning similar Alaska DMV records from Checkr, Inc., allowing Cornelius to continue driving despite the expired medical certificate. See Uber Depo. at 47:19-48:3 (stating that "an expired medical certificate for a commercial driver's license will not impact your eligibility to" work for Uber, Inc.). The jury is entitled to consider that evidence in determining whether SambaSafety's MVRs accurately conveyed the Alaska DMV's records or instead create a materially misleading impression. This case does not present a dispute over whether the Alaska DMV's data is accurate. Rather, the case presents a dispute over whether SambaSafety changes the meaning of the Alaska DMV's data as it moves through automated systems before reaching Uber, Inc. The FCRA places the risk of potential transformation on SambaSafety. A reasonable jury can conclude that, somewhere between the Alaska DMV's XML data and SambaSafety's JSON report, SambaSafety adds, omits, or interprets information in a manner that unjustly harms Cornelius. Whether that occurs is a question for the jury, not the Court.

SambaSafety's interpretation of the evidence is neither implausible nor unreasonable. Another jury may well have accepted it. Rule 50 does not permit, however, the Court to decide which of two reasonable interpretations is more persuasive. See Shaw v. AAA Eng'g. & Drafting, 213 F.3d at 529. See RJMOL Response at 5 ("Samba does not identify an absence of evidence on accuracy; it asks the Court to reweigh the record and credit Samba's preferred interpretation . . . ."). Rule 50 asks only whether the evidence points but one way. See Crumpacker v. Kan. Dep't of Human Res., 474 F.3d at 751. Here, it does not. Because the trial record permits a reasonable jury to conclude that SambaSafety's MVR modifies the Alaska DMV's data, presenting a misleading impression, the Court cannot conclude, as a matter of law, that SambaSafety merely reports the complete government records without interpretation.

Nor do the authorities on which SambaSafety relies compel a different result. In Oyedeji v. Checkr, Inc., No. CV 23-04096, 2024 WL 1598697 (D.N.J. Apr. 12, 2024)(Semper, J.)("Oyedeji"), the district court notes that CRAs generally have no duty "'to ensure [the] comprehensiveness of Plaintiff's background report'" when the CRA obtains the information from the "current public record." No. CV 23-04096, 2024 WL 1598697, at *5 (quoting Bautista v. Checkr, Inc., No. CV-233796 ZNQRLS, 2024 WL 772552, at *5 (D.N.J. Feb. 26, 2024)(Quraishi, J)). That general principal presupposes, however, that the CRA faithfully communicates the substance of the underlying public record. See Oyedeji, No. CV 23-04096, 2024 WL 1598697, at *4 (stating that the "fact that Plaintiff now has a valid license, and the matter was 'settled by the Court' does not negate the accuracy of the information reported"). There, the consumer report accurately reflects that the plaintiff's commits certain driving offenses; the dispute concerns whether those offenses should remain in the consumer report. See Oyedeji, No. CV 23-04096, 2024 WL 1598697, at *2. Here, by contrast, SambaSafety's MVRs communicate a driving status

that is completely at odds with the Alaska DMV's data. The difference in facts undermines SambaSafety's reliance on Oyedeji. Here, the question is not whether the FCRA requires SambaSafety to provide context to an official government record; rather, the question centers on whether SambaSafety's MVR communicates the meaning of that official government record.

Rule 50 permits judgment as a matter of law only when the evidence permits but one reasonable conclusion. Here, the evidence supports competing, reasonable interpretations of SambaSafety's reporting. A reasonable jury can conclude that, although SambaSafety extracts data directly from the Alaska DMV's database, SambaSafety inadvertently adds, omits, or incorrectly interprets information as it passed the data from the Alaska DMV's system to Uber, Inc.'s systems. Because the trial record supports the jury's finding that SambaSafety's MVR creates a misleading impression, judgment as a matter of law is inappropriate as to the issue of accuracy.

## II. SambaSafety is not entitled to judgment as a matter of law on the issue of whether it employs reasonable procedures to assure maximum possible accuracy, because there is a legally sufficient evidentiary basis for the jury to conclude that SambaSafety does faithfully and completely report an official government record.

The Court concludes that judgment as a matter of law is not appropriate, because the jury reasonably could conclude that SambaSafety does not faithfully and completely report the Alaska DMV's records. SambaSafety argues that even if the Court rules against it on the issue of accuracy "SambaSafety is still entitled to judgment on Plaintiff's § 1681e(b) claim because it was reasonable as a matter of law for SambaSafety to rely on and report the same information as the official government source for that information." RJMOL Memo at 13. In Cassara, the Tenth Circuit explains that:

> If a consumer reporting agency accurately transcribes, stores and communicates consumer information received from a source that it reasonably believes to be reputable, and which is credible on its face, the agency does not violate this section simply by reporting an item of information that turns out to be inaccurate.

276 F.3d at 1217. Here, SambaSafety's reasonable-procedures argument fails, because the trial record does not compel the necessary factual premise, that SambaSafety faithfully and completely reports the Alaska DMV's records. The Court accepts SambaSafety's legal proposition that a CRA acts reasonably as a matter of law when it accurately "transcribes, stores and communicates consumer information" official government records. RMOL Reply at 4. The jury is not required to find, however, that SambaSafety did so. See RJMOL Response at 9 ("The evidence permitted the jury to find that Samba did not simply pass through Alaska DMV data; rather, it used its own process to interpret and report that data in a way not unsupported by the face of the XML."). As explained above, the trial evidence permits the conclusion that SambaSafety interpreted, associated, and transformed the Alaska DMV's data before transmitting it to Uber, Inc. For that reason, the Court need not revisit its earlier analysis. The same evidence that supports the jury's finding of inaccuracy also supports its finding that SambaSafety failed to employ reasonable procedures to assure maximum possible accuracy.

## III. THE JURY BASIS ITS FINIDNG OF 15 U.S.C. § 1681i LIABILITY UPON A LEGALLY SUFFICENT EVIDENTIARY BASIS.

Judgment as a matter of law for SambaSafety is not proper, because the jury's § 1681i verdict does not lack a legally sufficient evidentiary basis. SambaSafety argues that the Court should enter judgment as a matter of law on its behalf, because (i) Cornelius "failed to identify any specific 'items of information' she claimed to dispute"; and (ii) "her claim under § 1681i(a) accrued only after she indisputably failed in her duty to mitigate her claimed damages". RJMOL Memo at 14. In response, Cornelius argues that: (i) Isanaka repeatedly testifies that the First Dispute Cornelius files with SambaSafety "clearly disputed Samba's reporting of her license status," RJMOL Response at 12; and (ii) that the First Dispute and the Second Dispute that Cornelius files with SambaSafety are mitigation efforts, see RJMOL Response at 17. After

reviewing the evidentiary record, the Court concludes that judgment as a matter of law in favor of SambaSafety is not appropriate as to the issue of § 1681i liability. Before addressing the jury's legally sufficient basis, the Court takes a step back to properly contextualize the role that trials and juries play in our democratic republic.

**A. JURY TRIALS ARE FOR TRUTH SEEKING, NOT STORY CRAFTING.**

The Court was disappointed when a clerkship applicant opened his cover letter by pointing to an article in The New Yorker quoting the Honorable Shira Scheindlin, United States District Judge for the Southern District of New York, as saying: "I don't love trials. They are not a good way to tell a story." Jeffrey Toobin, Rights and Wrongs, THE NEW YORKER (May 27, 2013), available at http://www.newyorker.com/magazine/2013/05/27/rights-and-wrongs-2 ("Toobin Article"). She went on: "What I really like to do is write opinions. There you get to do what you think is right, what you believe in. You're pushing the margins of the envelope, being willing to be creative." Toobin Article. The law clerk applicant then says that Judge Scheindlin "has nicely summed up" his "own view of being a litigator." Toobin Article. The applicant states: "It is the briefs, and not the trials, that make me tick. I'm applying to your chambers because the opportunities to tell good stories are rare in my current job -- as are the opportunities for 'pushing the margins of the envelope.'" Toobin Article.

It is troubling that a trial judge does not like trials. If the nation's trial judges do not like or believe in trials, how do we expect the people to accept trials? The American judicial system is built on the premise that the trial is the best truth-seeking mechanisms ever devised. Thomas Jefferson explained the importance of trial to Thomas Paine, saying: "'I consider trial by jury as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution.'" Clay Conrad, Trial by Jury, CATO Institute (Dec. 19, 1998)(quoting Letter from

Thomas Jefferson to Thomas Paine, July 11, 1789).

Judge Scheindlin complains that trials "are not efficient." Toobin Article. That thought is hardly original. Edson Sunderland -- a prolific writer who authored more than 130 articles on legal issues -- explains in 1915:

> [T]he people and the courts in most American jurisdictions have departed from the common law practice and have introduced a principle calculated to undermine the very institution which they wish to strengthen. That is to say, through the rules prohibiting judges from commenting on the weights of the evidence, juries tend to become irresponsible, verdicts tend to become matters of chance, and the intricacy of procedure, with its cost, delay and liability to error, has increased so much as to threaten popular respect for courts of justice.

Edson R. Sunderland, The Inefficiency of the American Jury, 13 MICH. L. REV. 302, 302 (1915). The idea, however, that our judicial system is not efficient has not always been considered a criticism. In Federalist Paper 78, Alexander Hamilton notes that "the independence of the judges may be an essential safeguard against the effects of occasional ill humors in the society." THE FEDERALIST NO. 78 (Alexander Hamilton). That the judiciary is deliberative, perhaps slowing down an overheated political process and carefully reviewing the political branches' decisions, is a good thing.

Also, when people say that they do not like trials, they probably are including jury trials. Such modern criticism is contrary to the praise that the Founders had of trials, especially jury trials. They considered juries a bulwark of our liberty. The Court states in United States v. Courtney, 960 F. Supp. 2d 1152 (D.N.M. 2013)(Browning, J.):

> The Court concludes that, the Supreme Court and especially Tenth Circuit precedent allowing the jury to know about sentencing ramifications only if its participation in sentencing is required, and precedent preventing the jury from learning about its nullification right, are inconsistent with trial practices at the Founders' time, and that these practices have eroded the Sixth Amendment jury trial right as the Farmers understood that right.

960 F. Supp. 2d at 1154.

A criticism of trials as inefficient is an elitist viewpoint. Instead of seeing trials as one of the most democratic things the United States of America does, week after week, across the country, the elite see juries as a roadblock, hurdle, or speed bump in the elites' narrative of how things ought to be. Ask any criminal defendant how he views the jury after the press, cable television, and talk radio have already convicted him, and the accused's viewpoint will likely differ from those of the elite. Juries are messy. They get in the way of the elites' narrative and expose weakness in the elite's storyline.

Judge Scheindlin says that trials are not a good way to tell a story. Again, without a trial, there would likely be no cross-examination. Wigmore calls cross-examination, appropriately so, "the greatest legal engine ever invented for the discovery of truth." 5 J. Wigmore, EVIDENCE § 1367, p. 29 (3d ed. 1940). Without trials and cross-examination, the search for the truth is severely compromised. Again, the judiciary's purpose is not to tell good stories that the elite want the nation to hear; the purpose of trials is to find the truth and to allow the jury -- the people -- to find the truth. The process -- not just the end result -- is important to how this story ends, to how the public accepts the story's end, and to how the nation or community decides whether the appearance of justice has been met. Getting the answer is only one-half of the district court's task. The other half is to uphold the appearance of justice.

Judge Scheindlin says that trials are often tedious. There are times trials are tedious for judges and juries. It is less likely that they are tedious for the litigants for whom, in most cases, the trial is all about. Trials are often tedious for judges at times because judges have seen it one-hundred or more times. The judge often knows what is going to happen and how it will happen. The Court played football through college and then became a litigator; even though the Court has seen countless football games, which can be tedious at times, it never has found an entire game

tedious. It always delights the Court when every football pundit predicts the game's outcome with absolute certainty, and then the game surprises everyone. This uncertainty is the reason to play the game rather than just vote on the game. The Court experiences the same excitement about trials. The Court enjoys voir dire, talking to lay people, and watching the lawyers pick a fair and impartial jury. The Court enjoys listening to the lawyers argue the case to the jury and watching how they deal with their case's weaknesses. The Court always enjoys cross-examination and seeing how the lawyers go about their craft. The Court even enjoys retrials, because, after a mistrial, the Court likes to see how the lawyers adjust. The Court thinks it is almost mystical when the jurors come together and unanimously give verdicts after a difficult trial. The Court enjoys the finality of verdicts: parties can quit obsessing over the dispute and move on. Importantly, the constant fear of committing reversible error also keeps the Court engaged, preventing boredom. Games and trials may have their tedious moments for judges, but there is plenty of excitement in both for spectators and judges to love them.

Trials can be tedious for juries at times, but for different reasons. Many jurors have not seen a trial from beginning to end, so the newness of everything usually prevents boredom. Jurors also have an important task: determining which story is true. When they make that decision and they think that it is time to deliberate, they are done. Juries usually get tired or frustrated when the lawyers -- oblivious to the jury's signal that they are toast -- beat points or arguments after the jury is ready to give its decision. Good lawyers know how fast trials go on television, and they do not try to drag them out in real life.

Trials are not tedious for the lawyers. Trials may be exhausting, but not tedious. The lawyers have to stay alert and on their toes every second, because the other side is always trying to slip something in. Trials are too difficult for trial lawyers to be tedious. Thus, when people say

trials are tedious, they may be saying that they are impatient with how the truth is discovered. Trials are not a microwave oven. Seeking the truth is hard work for everyone and is not for the faint of heart.

Judge Scheindlin says that what she really likes to do is write opinions: "There you get to do what you think is right, what you believe in. You're pushing the margin of the envelope, being willing to be creative." Toobin Article. There are times to write opinions, but there are also times to try cases. The Court is concerned that qualified immunity, summary judgment, heightened pleading requirements, and the Sentencing Guidelines' hefty reward for acceptance of responsibility too often makes federal district judges opinion writers than trial judges. The Court is not convinced that development is entirely good for the nation. Trials -- especially those that include juries -- might send louder and mere definitive messages to society than judges' opinions, particularly trial judges' opinions.

Judge Scheindlin says that she likes to write opinions, because "you get to do what you think is right . . . ." Toobin Article. It is unclear, however, why getting the law right and giving it to a jury in a jury instruction is not doing what is right, too. Nothing is more democratic than what happens in federal courtrooms all across the country each day -- putting aside the professionals for a moment, summoning to court the citizens, and having lay people apply the law that the political branches have passed, signed, enacted, and enforced, to the facts of the case. That process is very special. Anyone who has conducted voir dire and taken a verdict in the United States District Court for the District of New Mexico has felt the almost transcendent process of people coming from all across the fifth largest state in the union in terms of land, from twenty-one pueblos and four reservations, and a mixture of cultures, from all social-economic backgrounds, some single, some married, some gay, some straight, some conservative, some liberal, some religious, some

atheist or agnostic, to congregate for a few days, and become a group of citizens who make a decision -- unanimously -- about an issue of federal law. In contrast to a United States Congress that struggles to agree by fifty-one percent on many issues, what juries do unanimously, day after day, is truly remarkable. In a democracy, what the people say as a jury should mean more -- say more -- than what an unelected district court judge says in his or her opinion. In a Fourth Amendment case, despite the ways judges dress it up in a lengthy jury instruction, the Court basically hands a copy of the Bill of Rights to the jury and asks: "What is reasonable? What is excessive?" In a democratic society, it should not be as important what a district judge believes as what the elected officials believe and enact, and what the citizens, in their jury verdicts, decide.

Judge Scheindlin states that, when she is writing opinions, "[y]ou're pushing the margins of the envelope, being willing to be creative." Toobin Article. In the United States, a democratic society, the federal courts often cause more problems than help when they are creative and push the envelope's margins. The Italian Renaissance painter Giotto di Bondone was asked to paint little squares on the side of altars in Florence. If he had found that job tedious or unfulfilling, we might not have gotten some of the most beautiful paintings from the Italian Renaissance, including The Virgin and Child Enthroned with Angels (circa 1306-1310). The cy pres doctrine is an example of judges pushing the envelope. The Court explains in In re Thornburg Mortgage, Inc. Securities Litigation, 885 F. Supp. 2d 1097, 1106 (D.N.M. 2012)(Browning, J.): "Courts resort to cy pres where funds remain after distributing a class award and the court wishes to avoid (i) returning the funds to a defendant who has been found liable, or agreed it was liable, in that amount; and (ii) increasing the pro-rata share of the class members who file claims, potentially giving those class members a windfall." 885 F. Supp. 2d at 1106. Similarly, in the context of a class action, a court may employ the cy pres doctrine "'to put[] the unclaimed fund to its *next best*

compensation use, e.g., for the aggregate, indirect, prospective benefit of the class.'" Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 436 (2d Cir. 2007)(quoting 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 10:17 (4th ed.2002))(italics and alterations in Wilhelmina Model Agency, Inc. and not in 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions). The Court disagrees with the cy pres doctrine,

> for several reasons: (i) class actions are disputes between parties and the money damages should remain among the parties, rather than be distributed to some third party; (ii) it is unseemly for judges to engage in the selection of third-party beneficiaries and to distribute class action damages to third parties; (iii) judges are often not in the best position to choose a charitable organization that would best approximate the unpaid class members' interests; and (iv) the doctrine encourages charitable organizations, and plaintiffs' lawyers, to lobby the court for cy pres awards.

In re Thornburg Mortgage, Inc. Securities Litigation, 885 F. Supp. 2d at 1106-1107. The cy pres doctrine is an example of the potential harms that judges can bring by being creative and pushing envelopes.

While a federal judge's role in that republican form of government is very important, and personally can be very fulfilling from a career standpoint, when the judge begins to depart from his or her role, it can cause problems. A federal judge must be careful, cautious, and conservative. Jeffrey Toobin says of Judge Scheindlin: "Scheindlin's dedication to protecting citizen's rights is beyond question; it is less clear that she has the wisdom, or even the ability, to impose her vision in the real world of New York." Toobin Article. As smart as any federal judge may be, in a democratic society, judges largely lack the wisdom of the collective and the ability of many in an increasingly complex society, and should be hesitant to impose their vision of the world on their community. In a republic, that task is appropriately left to the majoritarian processes of the electoral system, circumscribed, of course, by the Constitution's guarantees.

### B. CORNELIUS IDENTIFIES THE "ITEM OF INFORMATION" THAT SHE DISPUTES.

Against this backdrop, the Court turns to SambaSafety's request that the Court substitute its view of the evidence for two factual determinations underlying the jury's § 1681i verdict. The Court declines to do so. The evidentiary record provides a sufficient basis for the jury's finding. To prevail under § 1681i, a plaintiff must "prove essentially the same elements as those for § 1681e(b) . . . in addition to proving they informed the CRA about the inaccuracy." Wright, 805 F.3d at 1242. Section 1681i(a)(1)(A), in turn, provides:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30–day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

15 U.S.C. § 1681i(a)(1)(A). Thus, Cornelius must identify the information that she disputes before a CRA's duty to reinvestigation arises.

SambaSafety contends that its reinvestigation duty never arises, because Cornelius fails "to dispute a specific item of reported information." RJMOL Memo at 14. In support of this contention, SambaSafety relies on Cohen v. Equifax Info. Servs., LLC, No. 18-CV-6210 (JSR), 2019 WL 5200759 (S.D.N.Y. Sept. 13, 2019)(Rakoff, J.)("Cohen"), aff'd, 827 F. App'x 14 (2d Cir. 2020). In Cohen, the court grants summary judgment for the defendants, reasoning that "the duty to reinvestigate is triggered only when the consumer identifies the 'item of information' that is purportedly incomplete or inaccurate." 2019 WL 5200759, at *7 (quoting 15 U.S.C. § 1681i(a)(1)(A)). There, the plaintiff disputes that her credit-utilization rate was too high, but "did not identify the account or accounts for which she claimed the utilization rate was too high."

Cohen, 2019 WL 5200759, at *7. The CRA therefore must determine for itself which among multiple accounts contain the improper utilization rate.

The concerns animating Cohen are not present here. Uber, Inc. asks SambaSafety to provide information from the Alaska DMV concerning whether Cornelius has a "valid license" or "any driving privileges." See Blake Depo. at 53:22-24. In the First dispute, Cornelius notifies SambaSafety that she disputes the "License Status" that SambaSafety reports to Uber, Inc. First Dispute. See RMOL Memo at 15. The fact that Cornelius possesses more than one license does not compel the conclusion that the First Dispute is unclear. The jury could find that the question Uber, Inc. expects SambaSafety to answer remains unchanged. Unlike the plaintiff in Cohen, Cornelius does not task SambaSafety with searching among multiple accounts or data fields to identify the item of information in dispute. She identifies the information she disputes -- the license status SambaSafety reports.

Lastly, SambaSafety asks the Court to disregard its own witness' testimony concerning whether Cornelius identifies an item of information in dispute as "irrelevant to the applicable objective inquiry about whether Plaintiff's disputes actually identified an 'item of information' to trigger § 1681i(a)." RJMOL Reply at 6. Accepting SambaSafety's premise that the inquiry is an objective one, the First Dispute satisfies an objective standard. As the Court explains above, Uber, Inc. asks SambaSafety to answer one question, concerning the validity of Cornelius' license. Cornelius, in turn, selects "License Status" as the category of her dispute and states: "your report is inaccurate since the company doesn't require a CDL and my license is valid." First Dispute. SambaSafety appears to demand greater precision -- that Cornelius identify not only the information that she disputes, but also the underlying ambiguity in the Alaska DMV data that causes SambaSafety to report that information inaccurately. See RJMOL Memo at 16 (stating "her

abstract claims regarding her license 'validity' and its 'status have no relevance here . . . ."). Section 1681i(a), however, requires the consumer to dispute an "item of information"; it does not require the consumer to identify the source of the alleged inaccuracy. See 15 U.S.C. § 1681i(a)(1)(A). After looking at the First Dispute and the Second Dispute, the Court concludes that Cornelius meets her burden of identifying the "item of information" in dispute.

The trial evidence provides a legally sufficient basis for the jury to reach that conclusion. Isanaka repeatedly testifies that Cornelius's clearly identifies the item of information in dispute. See Isanaka Day Three Tr. at 71:18-21 (Ristvedt, Isanaka)("Q. And you agreed, I think you agreed in your deposition, it is absolutely clear what her dispute is; right? A. Yes."); id. at 79:5-9 (Ristvedt, Isanaka)("Q. So when SambaSafety got [the First Dispute], you agreed with me, absolutely clear what she is disputing, what she's trying to get fixed; yes? A. Yes. Okay."); id. at 86:21-87:5 (Ristvedt, Isanaka)("Q. And you testified a few minutes ago it was absolutely, unequivocally, undeniably clear what the [First Dispute] was about; right? A. Yes."). The jury hears that testimony, observes Isanaka backtrack on whether SambaSafety investigates the First Dispute while under cross-examination, compare Isanaka Depo. at 128:25-129:10; with Isanaka Day Three Tr. at 102:4-114:14 (Isanaka), and considers those statements alongside the First Dispute and the Second Dispute. From that evidence, the jury reasonably could find that Cornelius identifies the "item of information" she disputes with sufficient specificity to trigger SambaSafety's duty to conduct a reasonable reinvestigation. 15 U.S.C. § 1681i(a)(1)(A). SambaSafety may disagree with the jury's view of the trial record, but disagreement does not indicate "the evidence points but one way." Bay v. Anadarko E&P Onshore LLC, 73 F.4th at 1215. The Court's task on a renewed motion for judgment as a matter of law is not to reweigh the evidence, substituting the Court's view of the facts for the jury's view of those fact, but to answer whether the jury has a

legally sufficient evidentiary basis for its findings. Here, it does. Accordingly, SambaSafety's "item of information" argument provides no basis for the Court to disturb the jury's § 1681i verdict.

**C. THE JURY HAS A LEGALLY SUFFICENT BASIS TO FIND THAT CORNELIUS SUFFERS DAMAGES UNDER § 1681i.**

The jury also has a legally sufficient evidentiary basis to find that Cornelius suffers damages under § 1681i. SambaSafety argues that Cornelius' § 1681i claim "fails for lack of provable damages." RJMOL Memo at 16. The chain of reasoning SambaSafety relies on goes like this. Cornelius files the First Dispute on May 27, 2024, and the Second Dispute on May 28, 2024. See RJMOL Memo at 6 (citing Tavernier Day Three Tr. at 15:16-23). After the Alaska DMV excepts Cornelius from the medical certificate requirements, Cornelius could ask Uber, Inc. to request a new MVR on her behalf. See RJMOL Memo at 17. Had Cornelius done so, SambaSafety contends, the MVR would show Cornelius is "eligible to resume driving for Uber based on Uber's criteria," as early as May 29, 2024. RJMOL Memo at 17 (citing DMV Depo. at 33:5-13). Because § 1681i affords SambaSafety thirty days to conduct its reinvestigation, SambaSafety reasons that Cornelius could return to work before her § 1681i claim accrues; therefore, "she cannot recover any actual damages for that claim." RJMOL Memo at 18.

**1. SambaSafety's failure to reinvestigate causes Cornelius' Damages.**

The Court disagrees that SambaSafety's chain of reasoning leaves the jury without a legally sufficient basis to support the jury's finding of causation. Section 1681i places the duty to conduct a reasonable reinvestigation on SambaSafety, not on Cornelius. See Wright, 805 F.3d at 1241. The jury hears testimony that SambaSafety has a "duty" and "shall" in "good faith" reinvestigate information that a consumer disputes. Ex. J-24 at 27. The jury hears evidence from SambaSafety that it unequivocally refuses to perform its statutory mandate for either the First Dispute or the

Second Dispute. See Tavernier Day Three Tr. at 77:23-78:24 (Ristvedt, Tavernier). The jury also hears evidence that Cornelius remains unable to drive for Uber, Inc. after SambaSafety informs her that it is unable to investigate her disputes, which occurs on June 7, 2024, and June 10, 2024. See RMOL Memo at 18 ("Plaintiff did not receive SambaSafety's response to her disputes until June 7 and June 10, 2024."). From that evidence, the jury reasonably could find that SambaSafety's failure, in its statutory mandate, to reinvestigate causes Cornelius' license-status problem to remain unresolved and her resulting damages to continue. Nevertheless, SambaSafety faults Cornelius for failing to diagnose and correct the communication problem between the Alaska DMV's, SambaSafety's, and Uber, Inc.'s APIs. The possibility that Cornelius could have found another way around SambaSafety's failure to reinvestigate may bear on whether she reasonably mitigates her damages. That possibility does not require, however, the jury to erase the consequences of SambaSafety's failure to perform the Congressional mandate.

**2. Cornelius Attempts to Mitigate Damages.**

SambaSafety's argument that Cornelius could have avoided those damages by requesting another MVR does not compel a different conclusion. See RJMOL Memo at 18. That Cornelius potentially could have taken an additional step to avoid or reduce her damages does not necessarily mean that SambaSafety's failure to reinvestigate does not cause those damages. Rather, whether Cornelius reasonably could have reduced her damages by returning to Uber, Inc. and requesting another MVR implicates mitigation and not causation. See RJMOL Memo at 25 ("Plaintiff suffered no actual damages caused by SambaSafety's alleged failure to investigate her disputes, because she was already offered an opportunity to resume driving for Uber more than a week *before* her dispute claim accrued.")(emphasis in the original). The possibility of an alternative means to avoid damages does not, without more, establish that SambaSafety's statutory violation

causes no damages as a matter of law.

The record contains, moreover, evidence from which the jury reasonably could find that Cornelius attempts to mitigate her damages. Cornelius responds that the First Dispute and the Second Dispute are themselves mitigation efforts. See RJMOL Response at 17 ("Plaintiff attempted to mitigate by **twice** disputing Samba's inaccurate reporting.")(emphasis in the original). The trial record shows also that Cornelius goes to the Alaska DMV to correct her medical certificate, see DMV Depo. at 33:5-13; and she contacts Uber, Inc. to resolve the issues, see Ex. J-19 at 3. SambaSafety nevertheless contends that the law requires Cornelius to take "reasonable steps to mitigate her damages vis-à-vis her employer independent of her also beginning the entirely separate FCRA dispute process." RJMOL Reply at 8 (citing Giandonato v. Sybron Corp., 804 F.2d 120, 123 (10th Cir. 1986)("Giandonato")). In truth, what SambaSafety calls a "failure to mitigate" is, in fact, a failure to mitigate SambaSafety's way. RJMOL Reply at 7-8. The jury is not required to accept SambaSafety's preferred method of mitigation as something the law requires of Cornelius.

Giandonato does not require a different result. In Giandonato, the Tenth Circuit considers whether "an employer can toll the further accrual of back pay liability by making an unconditional offer of reinstatement to the claimant" under the Age Discrimination in Employment Act, 29 U.S.C. § 621. 804 F.2d at 123. There, the Sybron Corporation ("Sybron, Co.") repeatedly offers Nunzio M. Giandonato ("Donato") an unconditional reinstatement of his position, providing the Donato a concrete opportunity to end his continuing economic injury. See Giandonato, 804 F.2d at 124 ("Donato did not comply with *Ford Motor Co.*'s mandate of minimizing his damages by refusing his employer's offer of reinstatement for the personal reasons . . . .")(italics in the original). Notably, the employer does more than offer Donato his job back. See Giandonato, 804

F.2d at 124. In addition to the unconditional offer of reinstatement, Sybron, Co. agrees to:

> (1) fully reinstate Donato with no loss of service (a condition not considered necessary in *Ford Motor Company*), and no reduction in salary; (2) hire a new district manager so that Donato would not have to report to Carlson; (3) not change future territory, accounts, and sales quotas except by written agreement between Donato and his manager; and (4) stipulate that Donato would not have to repay any of the severance pay he had received.

Giandonato, 804 F.2d at 124-25. On those facts, the Tenth Circuit concludes that the Donato's repeated refusal of reinstatement "eliminated any viable claim he may otherwise have had for back pay and reinstatement." Giandonato, 804 F.2d at 125.

The record here presents a different question under materially different circumstances. Neither Uber, Inc. nor SambaSafety offers Cornelius an unconditional offer of reinstatement, much less offer to make accommodations in an effort to make the process simpler for Cornelius to begin driving again. Instead, SambaSafety stonewalls Cornelius' efforts with boilerplate language that she does not provide enough information for it to reinvestigate her claims. Uber, Inc., for its part, asks Cornelius to upload the same drivers license she uses before SambaSafety's MVR. See RJMOL Memo at 17 ("'To facilitate this, we kindly ask you to upload your current Driver's License . . . .'" (quoting Ex. J-19)). Unlike the reinstatement offers in Giandonato, however, Uber, Inc.'s suggestion does not guarantee the end of Cornelius' economic injuries. Uploading Cornelius' same license requires Cornelius to initiate another MVR through the same reporting process that already produces the license-status dispute that SambaSafety twice refuses to correct. Giandonato therefore does not establish that Cornelius' failure to pursue SambaSafety's proposed alternative renders her mitigation efforts unreasonable as a matter of law.

Finally, the Court notes that Giandonato illustrates the distinction between causation and mitigation which SambaSafety's argument blurs. The Tenth Circuit does not conclude that Donato's ability to accept reinstatement eliminates all damages Sybron, Co.'s unlawful conduct

causes. See Giandonato, 804 F.2d at 125. Rather, the unconditional offer of reinstatement tolls the continued accrual of those damages because the employee thereafter has a reasonable opportunity to end his economic injury. Giandonato, 804 F.2d at 123. Thus, even assuming that Cornelius' request for another MVR would result in her reinstatement, that possibility does not establish that SambaSafety's failure to reinvestigate causes no damages. Accordingly, the jury has a legally sufficient evidentiary basis to find both that SambaSafety's failure to reinvestigate causes Cornelius' damages and that Cornelius takes steps to mitigate those damages. SambaSafety may believe that Cornelius should have taken an additional or a more effective step, but the law does not require the jury to share that view. Whether the record sufficiently supports the amount of damages that the jury awards based on Cornelius' mitigation efforts is a separate question. The Court addresses that question below in its discussion of remittitur.

## IV. THE TRIAL RECORD SUPPORTS THE JURY'S FINDING THAT SAMBASAFETY WILLFULLY VIOLATES THE FCRA.

The Court concludes that the trial record sufficiently supports the jury's finding that SambaSafety willfully violates the FCRA. SambaSafety makes two arguments concerning whether its conduct is willful: (i) that it "is entitled to judgment on Plaintiff's claim for a 'willful' violation of § 1681i(a)," RJMOL Memo at 19; and (ii) the "jury's $200,000 punitive damages award with respect to the § 1681e(b) claim . . . must be vacated," RJMOL Memo at 20. First, SambaSafety argues that it does not willfully violate § 1681i(a), because it has "'a foundation in the statutory text'" for not reinvestigating the First Dispute or the Second Dispute. RJMOL Memo at 19 (quoting Safeco, 551 U.S. at 69). Regarding, the willfulness of the SambaSafety's § 1681e(b) claim, it argues that the Court must vacate the award, because the jury awards punitive damages without finding the violation is willful. See RJMOL Memo at 20.

SambaSafety's "reasonable foundation" argument finds little support in the trial record. As the Court explains above, the evidence permits the jury to conclude that SambaSafety fails to reinvestigate Cornelius' dispute even though Cornelius clearly identifies the information she believes is inaccurate. See First Dispute; Second Dispute. SambaSafety contends that its conduct is not willful, because it reasonably believes Cornelius fails to identify what item of information she disputes. See RJMOL Memo at 19. But the jury hears testimony from SambaSafety's own witnesses that Cornelius' plainly identifies the item of information in dispute. See Isanaka Day Three Tr. at 71:18-21; id. at 79:5-9; id. at 86:21-87:5; SambaSafety Depo. at 125:9-25; id. at 162:2-14; id. at 163:9-11; id. at 165:1-8. The jury also hears testimony that SambaSafety's system links the First Dispute and Second Dispute, such that if the First Dispute clearly identifies the information in dispute, the Second Dispute necessarily did as well, because nothing changes between MVRs. See Isanaka Day Three Tr at 82:14-83:8; *id.* at 85:12 86:17; *id.* at 87:10-88:12; *id.* at 91:9-12. That testimony undercuts SambaSafety's claim that it was relying on a reasonable interpretation of § 1681i. Indeed, SambaSafety's own evidence effectively conceded that the disputed item of information was clear. Despite the clear statutory mandate and with the knowledge of what Cornelus disputes, SambaSafety nevertheless declines to reinvestigate either the First Dispute or the Second Dispute. See Tavernier Day Three Tr. at 77:23-78:24 (Ristvedt, Tavernier). In the Court's view, that evidence is sufficient to sustain the jury's finding of willfulness under § 1681i.

The result is different as to the § 1681e(b) claim. Cornelius "does not oppose vacating punitive damages under Count I." RJMOL Reply at 2 n.3. The Court agrees. Because the jury does not find a willful violation of § 1681e(b), punitive damages are unavailable on Count I. Therefore, the Court vacates the jury's punitive damages award as to Count I. Accordingly, the

Court grants the RJMOL Motion in regards to the vacatur of the punitive damages under Count I.

## V. THE JURY'S DAMAGES ARE NOT CONTRARY TO THE EVIDENCE.

According to the greater weight of the BMW of N. Am., Inc. v. Gore, 517 U.S. 559 (1996)("Gore") guideposts, the Court concludes that the jury's $400,000 punitive damages award is not constitutionally excessive. "'[T]he Due Process Clause prohibits the imposition of punitive damages that are "grossly excessive or arbitrary punishments on a tortfeasor." Lompe v. Sunridge Partners, LLC, 818 F.3d 1041, 1063 (10th Cir. 2016)("Lompe")(quoting Jones v. United Parcel Serv., Inc., 674 F.3d 1187, 1206 (10th Cir. 2012)). In determining whether a punitive damages award comports with due process, courts consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418 (2003)("State Farm"). Because reprehensibility is "'[p]erhaps the most important indicium of the reasonableness of a punitive damages award,'" the Court begins there. Guidance Endodontics, LLC v. Dentsply Int'l, Inc., 791 F. Supp. 2d 1026, 1040 (D.N.M. 2011)(Browing, J.)(quoting Gore, 517 U.S. at 575). Before considering the Gore guideposts, the Court notes the applicable standard of review. Unlike the " the deferential JMOL standard or the new trial or remittitur standards" for liability or compensatory damages, the Court reviews the constitutionality of a punitive damages award under the Due Process Clause de novo. Lompe, 818 F.3d at 1062. The Tenth Circuit states this de novo review is "exacting." Lompe, 818 F.3d at 1062 ("Because the Supreme Court has directed lower federal courts to apply an 'exacting' de novo standard of review when considering the constitutionality of a punitive damages award, the district court erred by deferring to the jury's

punitive damages award.").

The first reprehensibility factor is in Cornelius' favor. During trial, Cornelius testifies that the anxiety and stress of her losing her job results in headaches and insomnia. Cornelius Day One Tr. at 25:6-25; id. at 34:23-35:4; id. at 50:13-16; id. at 56:20-57:21; id. at 64:11-65:15. As for the second factor, there is no evidence that SambaSafety acts with indifference or reckless disregard for the health or safety of other. The evidence indicates that Cornelius is financially vulnerable. See Cornelius Day One Tr. at 56:20-57:21 (discussing her financial distress). After losing her job, Corneilus must rely on financial assistance from her son. See Cornelius Day One Tr. at 56:20-57:21. That factor favors punitive damages. The fourth factor, however, is indeterminate. Cornlius argues that SambaSafety' conduct is "repeated," because it refuses to reinvestigate her dispute on two occasions. RJMOL Response at 21. The Supreme Court and other United States Circuit Courts of Appeal other than the Tenth Circuit, however, generally understand this factor to examine whether the defendant engages in similar misconduct toward other consumers, not merely repeated conduct within the same dispute. See State Farm, 538 U.S. at 423-24 (rejecting the plaintiffs' evidence of State Farm's actions toward third parties, because that evidence was not "of the sort that injured them"); Willow Inn, Inc. v. Pub. Serv. Mut. Ins. Co., 399 F.3d 224, 232 (3rd Cir.2005)("The 'repeated conduct' cited in *Gore* involved not merely a pattern of contemptible conduct within one extended transaction (i.e., the sale of one automobile to Dr. Gore), but rather specific instances of similar conduct by defendants in relation to other parties."); Chicago Title Ins. Co. v. Magnuson, 487 F.3d 985, 1000 (6th Cir.2007)(holding that, "we interpreted the repeated conduct factor to require that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with plaintiff . . . ."). Although SambaSafety denies Cornelius' reinvestigation requests

twice, those refusals arose from the same reporting dispute and do not demonstrate the sort of repeated misconduct that the Supreme Court identifies as reprehensible. Finally, nothing in the record suggests that SambaSafety acts with "malice, trickery, or deceit," or intends to harm Cornelius. Lompe, 818 F.3d at 1066 (finding the defendants conduct a "mere accident," because "neither the jury nor the district court found that AMC acted with the intent to harm" the plaintiff). Rather, the evidence supports a finding that SambaSafety does not fulfill its statutory obligations. In summary, two of the five reprehensibility factors favor Cornelius and two plainly do not, with one being neutral. Accordingly, the Court finds this guidepost neutral as to whether the punitive damages award should stand.

The second guidepost -- the disparity between the actual or potential harm and the punitive damages award -- is leans towards Cornelius. The jury awards $80,000.00 in compensatory damages and $400,000 in punitive damages, producing a five-to-one ratio. See Verdict Form at 5, filed February 20, 2026 (Doc. 157). Such a ratio is squarely within the single-digit ratios that the Supreme Court generally approves. See State Farm, 538 U.S. at 410 (stating that "few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process"). Importantly, this second guidepost also accounts for the "potential harm" SambaSafety's conduct causes, not merely the harm actual harm the Verdict Form reflects. See Gore, 517 U.S. at 575. Although the Verdict Form indicates Cornelius' actual damages, the potential consequences of an inaccurate consumer report, including the loss of employment and emotional distress for a year, are potentially greater, weighing in favor of a larger punitive award. The Court therefore concludes that this guidepost is neutral but leans in favor of Cornelius.

The third guidepost favors Cornelius. Congress expressly authorizes punitive damages under the FCRA to punish and deter willful violations of the statute. See Northrop v. Hoffman of

Simsbury, Inc., 12 F. App'x 44, at *5 (2d Cir. 2001)("The purpose of punitive damages under FCRA . . . is deterrence."). A one-to-one ratio is not required merely because it may represent the constitutional ceiling in some cases involving substantial compensatory damages. See Lompe, 818 F.3d at 1068 (stating that "even a 2:1 ratio may be unconstitutional in some circumstances" involving substantial compensatory damages). Here, a punitive award greater than the compensatory award advances Congress' objective of deterring CRAs from willfully disregarding their statutory obligations, as the jury finds SambaSafety does. See Verdict Form at 4. This guidepost therefore weighs in favor of sustaining a punitive damage award.

Balancing the three guideposts, the Court concludes that the jury's $400,000 punitive damages award does not exceed the Due Process Clause's constitutional limits. The third guidepost favors Cornelius, and the second is neutral but leans in her favor. The first guidepost, which is the most important of the three, is on balance neutral. After carefully considering the facts of the case, the Court concludes that punitive damages ratio of five-to-one is within constitutional limits and effectuates Congress' purpose in enacting the FCRA.

## VI. SAMBASAFETY DOES NOT OVERCOME THE COMMON-LAW RIGHT OF ACCESS TO JUDICIAL RECORDS.

The Court denies the Motion to Seal, because SambaSafety does not meet the "heavy burden" of justifying the Motion to Seal. Helm v. Kansas, 656 F.3d 1277, 1293 (10th Cir. 2011). As the Tenth Circuit notes, "a generalized allusion to confidential information" does not alone justify a motion to seal. JetAway Aviation, LLC v. Bd. of Cnty. Comm'rs of Cnty. of Montrose, Colo., 754 F.3d at 827. Moreover, this dispute centers on the reasonableness of SambaSafety's procedures, making the documents the reflect those procedures important for determining Cornelius' "substantive legal rights" important to the public. Riker v. Fed. Bureau of Prisons, 315

F. App'x 752, 755 (10th Cir. 2009).[4] That SambaSafety alleges the Confidential Materials will cause economic harm if the Court does not impose a seal upon them does not explain how or what economic harm will occur. Accordingly, because SambaSafety does not make the necessary showing, the Court denies the Motion to Seal.

## VII. THE COURT ENTERS JUDGMENT PURSUANT TO RULE 58(d) OF THE FEDERAL RULES OF CIVIL PROCEDURE.

The Court enters judgment having carefully considered the Bench Memo, the RJMOL Motion, and the Motion to Seal. On February 20, 2026, the jury returns a verdict in favor of Conelius as to Count I, awarding her $40,000.00 in actual damages after finding that SambaSafety negligently violates 15 U.S.C. § 1681e(b). Verdict Form at 2-3, filed February 20, 2026 (Doc. 157). As to Count II, the jury returns a verdict in favor of Cornelius, awarding her $40,000.00 in actual damages and $400,000.00 in punitive damages after finding SambaSafety willfully violates 15 U.S.C. § 1681i. Verdict Form at 4-5. Accordingly, the Court enters judgment in favor of Cornelius as to Count I and Count II. On Count I Cornelius shall recover from SambaSafety in the amount of $40,000.00 plus attorney's fees and costs. On Count II, Cornelius shall recover

---

[4] Riker v. Fed. Bureau of Prisons is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The United States Court of Appeals for the Tenth Circuit states:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Riker v. Fed. Bureau of Prisons has persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

from SambaSafety in the amount of $440,000.00. Lastly, Cornelius shall recover attorneys' fees and costs from SambaSafety pursuant to 15 U.S.C. §§ 1681n and 1681o. Accordingly, the Court grants the Motion for Entry of Judgment

**IT IS ORDERED**: that (i) Defendant Safety Holdings, Inc.'s Bench Memorandum in Support of Motion for Judgment as a Matter of Law, filed February 18, 2026 (Doc. 145), is denied; (ii) Plaintiff's Request for Entry of Judgment Pursuant to Federal Rule of Civil Procedure 58(d), filed March 2, 2026 (Doc. 159), is granted; (iii) Defendant Safety Holdings, Inc.'s Opposed Motion for Judgment as a Matter of Law and, Alternatively, for Remittitur, filed March 20, 2026 (Doc. 163), granted in part and denied in part; (iv) Defendant Safety Holdings, Inc.'s Opposed Motion for Protective Order, filed March 25, 2026 (Doc. 165), is denied; (v) the punitive damages for Count I of the Verdict Form are vacated; (vi) the Court awards Plaintiff $40,000.00 in actual damages for Count I for negligently violating 15 U.S.C. § 1681e(b); (vii) the Court awards Plaintiff $40,000.00 in actual damages for willfully violating 15 U.S.C. § 1681i; (viii) the Court awards Plaintiff $400,000.00 in punitive damages for willfully violating 15 U.S.C. § 1681i; (ix) the Court awards Plaintiff attorneys' fees and costs; and (x) the Court enters judgment for the Plaintiff and against the Defendant in the amount of $480,000.00 plus attorneys' fees and costs.

UNITED STATES DISTRICT JUDGE

*Counsel:*

James Ristvedt
David Chami
Tarek Chami
Consumer Justice Law Firm PLC
Scottsdale, Arizona

*Attorneys for the Plaintiff*

Timothy J St. George
Noah DiPasquale
Andrea McDonald Hicks
Peter Cox
Troutman Pepper Locke LLP
Richmond, Virginia

*Attorneys for the Defendant*